GENTILE et al., Appellants,

v.

RISTAS et al., Appellees.

[Cite as Gentile v. Ristas, 160 Ohio App.3d 765, 2005-Ohio-2197.]

Court of Appeals of Ohio,
Tenth District, Franklin County.

Nos. 04AP–547, 04AP–647 and 04AP–704.

Decided May 5, 2005.

768

John Breen, for appellants.

Hahn, Loeser & Parks, L.L.P., Stephen E. Chappelear, and Anthony J. Miller, for appellee Mark Bradley Ristas.

William J. Christensen, for appellee Criterium–Withem/Liszkay Engineers.

Ulmer & Berne and Charles R. Janes, for appellee Feazel Roofing Company.

---

DESHLER, Judge.

{¶ 1} Plaintiffs-appellants, David and Beth Gentile, appeal from judgments of the Franklin County Court of Common Pleas granting summary judgment in favor of three of the defendants the Gentiles sued in connection with their purchase of residential real estate in December 2001. Defendants-appellees are various persons and entities involved in the real estate transaction, including Mark Bradley Ristas, the seller of the property, Feazel Roofing ("Feazel"), a roofing contractor hired by Mr. Ristas, and Criterium—Withem/Liszkay Engineers ("Criterium"), a structural-engineering firm hired by Mr. Ristas.

{¶ 2} The property at issue is a single-family home located at 8643 Gavington Court, Dublin, Ohio. Until late 2001, the property was owned by Mr. Ristas and his wife, Pamela.[1] Shortly before listing the property for sale, Mr. Ristas contracted with Feazel to replace the entire roof; the work was completed in August 2001.

{¶ 3} In late July 2001, Mr. Ristas entered into an agreement with defendants Charles Totonis and Premier Residential Group, Inc., d/b/a REMAX Premier ("Remax") to serve as real estate agents for the sale of the home. At the same time, Mr. Ristas completed the residential-property-disclosure form required by R.C. 5302.30. Thereafter, Mr. Ristas listed the house and property for sale for $426,000.

{¶ 4} In September 2001, in connection with the sale of their former residence, the Gentiles hired Mr. Totonis and Remax to act as their real estate agents for the purchase of a new home. In late October 2001, Mr. Totonis showed the Ristas home to the Gentiles. Based upon their observations of the home and a review of the property disclosure form provided by Mr. Ristas, the Gentiles, on

---

1. Pamela Ristas is not a party to this action.

November 3, 2001, entered into a purchase agreement to buy the home for $395,000.

{¶ 5} Thereafter, the Gentiles contracted with ProCheck Engineering ("Pro-Check"), a home-inspection company. On November 10, 2001, a ProCheck inspector inspected the property and prepared a report detailing a variety of problems. The Gentiles, troubled by the number and scope of the problems, told Mr. Totonis they wanted to rescind the purchase agreement. Mr. Totonis urged them to meet with Mr. Ristas to discuss their concerns. At a meeting in November 2001, Mr. Totonis, Mr. Ristas, and the Gentiles discussed the issues raised in the ProCheck report. Mr. Ristas indicated he was willing to cure, at his expense, all the problems noted in the ProCheck report. To that end, Mr. Ristas hired Criterium as well as defendants New Wave Electric, Inc. ("New Wave") and Buckeye Landscape, Inc. ("Buckeye"). After these entities completed their tasks, the Gentiles, seemingly satisfied that the problems with the house had been resolved, agreed to proceed with the purchase.

{¶ 6} In connection with the closing, the Gentiles hired Quality Pest Control ("Quality Pest") to inspect the home for termites. Following the inspection, Quality Pest prepared a detailed report. Based upon the findings in the report, Mr. Ristas contracted with Quality Pest to treat the home for termites at his expense. On December 10, 2001, the parties closed on the property.

{¶ 7} Subsequent to the closing, the Gentiles experienced multiple problems with the home. After several failed attempts to have the problems remedied, the Gentiles, on January 28, 2003, filed suit against Mr. Ristas, Mr. Totonis, Remax, New Wave, Buckeye, Quality Pest, Feazel, and Criterium. All of the defendants filed motions for summary judgment. The trial court denied summary judgment to Mr. Totonis, Remax, New Wave, Buckeye, and Quality Pest. On April 29, June 3, and July 8, 2004, respectively, the trial court filed judgments granting summary judgment to Mr. Ristas, Criterium, and Feazel. The Gentiles timely appealed from all three judgments, and the cases were docketed separately. By journal entry filed July 20, 2004, this court sua sponte consolidated the cases for purposes of appeal.

{¶ 8} In their appeal of the trial court's grant of summary judgment in favor of Mr. Ristas, the Gentiles set forth the following two assignments of error:

[1]. The lower court erred to the prejudice of plaintiff-appellant by granting summary judgment on the basis of caveat emptor when there exist disputes over material facts between the parties.

[2]. The lower court erred to the prejudice of plaintiff-appellant by granting summary judgment on the basis of caveat emptor when defendant-appellee Ristas is not entitled to judgment as a matter of law.

{¶ 9} The Gentiles also appeal the trial court's grant of summary judgment in favor of Criterium and present a single assignment of error, as follows:

[1]. The lower court erred to the prejudice of plaintiff-appellant by granting summary judgment in favor of defendant-appellee Criterium where there exists a dispute over material facts relative to the breach of contract, negligence and/or misrepresentation of defendant-appellee Criterium.

{¶ 10} Finally, the Gentiles challenge the trial court's grant of summary judgment in favor of Feazel, advancing two assignments of error:

[1]. The lower court erred to the prejudice of plaintiff-appellant by granting summary judgment in favor of defendant-appellee Feazel Roofing because appellants were third-party beneficiaries of the relationship between appellee Ristas and appellee Feazel and/or were in direct privity thereto.

[2]. The lower court erred to the prejudice of plaintiff-appellant by granting summary judgment in favor of defendant-appellee Feazel roofing because Feazel was negligent and misrepresented material findings to appellants.

{¶ 11} The Gentiles essentially argue that the trial court erred in granting defendants-appellees' motions for summary judgment. An appellate court reviews a summary judgment disposition independently and without deference to the trial court's determination. *Brown v. Scioto Cty. Bd. of Commrs.* (1993), 87 Ohio App.3d 704, 711, 622 N.E.2d 1153. In conducting such a review, an appellate court applies the same standard employed by the trial court. *Maust v. Bank One, Columbus, N.A.* (1992), 83 Ohio App.3d 103, 107, 614 N.E.2d 765. Accordingly, an appellate court "review[s] the same evidentiary materials that were properly before the trial court at the time it ruled on the summary judgment motion." *Am. Energy Serv., Inc. v. Lekan* (1992), 75 Ohio App.3d 205, 208, 598 N.E.2d 1315.

{¶ 12} Pursuant to Civ.R. 56(C), summary judgment is appropriate only where the evidence demonstrates that (1) no genuine issue of material fact remains to be litigated, (2) the moving party is entitled to judgment as a matter of law, and (3) viewing the evidence most strongly in favor of the nonmoving party, reasonable minds can come to but one conclusion, and that conclusion is adverse to the nonmoving party. *State ex rel. Grady v. State Emp. Relations Bd.* (1997), 78 Ohio St.3d 181, 183, 677 N.E.2d 343. Only certain evidence may be considered by the court when rendering summary judgment. Specifically, the court is to consider only "the pleadings, depositions, answers to interrogatories, written admissions, affidavits, transcripts of evidence, and written stipulations of fact." Civ.R. 56(C). Any doubts must be resolved in favor of the nonmoving party. *Viock v. Stowe–Woodward Co.* (1983), 13 Ohio App.3d 7, 12, 13 OBR 8, 467 N.E.2d 1378.

{¶ 13} The party seeking summary judgment initially bears the burden of informing the trial court of the basis for the motion and identifying portions of the record demonstrating an absence of genuine issues of material fact as to the essential elements of the nonmoving party's claims. *Dresher v. Burt* (1996), 75 Ohio St.3d 280, 293, 662 N.E.2d 264. The moving party may not fulfill its initial burden simply by making a conclusory assertion that the nonmoving party has no evidence to prove its case. Id. Rather, the moving party must support its motion by pointing to some evidence of the type set forth in Civ.R. 56(C) that affirmatively demonstrates that the nonmoving party has no evidence to support the nonmoving party's claims. Id. If the moving party fails to satisfy its initial burden, the motion for summary judgment must be denied. Id. However, once the moving party satisfies its initial burden, the nonmoving party bears the burden of offering specific facts showing that there is a genuine issue for trial. Id. The nonmoving party may not rest upon the mere allegations and denials in the pleadings but instead must point to or submit some evidentiary material that demonstrates a genuine dispute over a material fact. Civ.R. 56(E); *Henkle v. Henkle* (1991), 75 Ohio App.3d 732, 735, 600 N.E.2d 791.

{¶ 14} With these standards in mind, we address the Gentiles' claims against each of the three defendants-appellees separately.

A. Claims against Mr. Ristas (case No. 04AP–547)

{¶ 15} In their complaint, the Gentiles raised five claims against Mr. Ristas: (1) fraudulent misrepresentation, (2) fraudulent concealment, (3) fraudulent inducement, (4) breach of contract, and (5) unjust enrichment. More particularly, the Gentiles' claims of fraudulent misrepresentation, fraudulent concealment, and fraudulent inducement alleged that Mr. Ristas both affirmatively misrepresented and neglected to disclose material facts concerning the property and that their decision to purchase the property was induced by those misrepresentations and/or nondisclosures. The Gentiles' breach-of-contract claim alleged that Mr. Ristas materially breached the purchase agreement by failing to provide all required information concerning the property. The Gentiles' unjust-enrichment claim alleged that but for Mr. Ristas's misconduct, the property would not have sold at the agreed-upon price, but would have sold, if at all, for a much lower price.

{¶ 16} Mr. Ristas filed a motion for summary judgment supported by the deposition of Mr. Gentile and the exhibits attached thereto. Those materials provide the following pertinent facts.

{¶ 17} The Gentiles toured the Ristas home with Mr. Totonis for 15 to 20 minutes on at least three separate occasions in late October 2001. On one of the visits, they noticed damage to a built-in cabinet adjacent to the fireplace on the

north wall of the main-floor family room. They also noticed that the basement carpet in the area directly beneath the fireplace was wet and that the basement smelled damp and musty. When they shared their concerns with Mr. Totonis, he assured them that any problems with the house would be revealed during a home inspection.

{¶ 18} Mr. Totonis provided the Gentiles a copy of the residential property form that Mr. Ristas had completed on July 30, 2001. Under Section C of the disclosure form, entitled "Roof," Mr. Ristas failed to answer the question: "Do you know of any current leaks or other material problems with the roof or rain gutters?" Instead, on the following line, which asked, "If 'Yes,' please describe," he wrote "new roof to be installed August 2001." Mr. Ristas also left blank the following question: "If owner knows of any leaks or other material problems with the roof or rain gutters since owning the property (but not longer than the past 5 years), please describe and indicate any repairs completed." Under Section D, entitled "Basement/Crawl Space," Mr. Ristas answered "No" to the following question: "Do you know of any current water leakage, water accumulation, excess dampness or other defects with the basement/crawl space?" Under Section G, entitled "Wood Boring Insects/Termites," Mr. Ristas failed to answer the question: "Do you know of the presence of any wood boring insects/termites in or on the property or any existing damage to the property caused by wood boring insects/termites?"

{¶ 19} On November 3, 2001, the Gentiles reviewed and signed the disclosure form and made an offer to purchase the home. Under the terms of the purchase contract, the Gentiles were permitted to have the property and all improvements, fixtures, and equipment inspected and tested and to have the property inspected for wood-destroying insects. The purchase contract also stated that if the Gentiles were not satisfied with the condition of the property as disclosed by the inspections and tests, they could elect to either deliver to Mr. Ristas or his agent a written request that Mr. Ristas remedy any unsatisfactory conditions or terminate the contract. Mr. Gentile testified that he was aware that the purchase offer was contingent upon satisfaction with the inspections and tests.

{¶ 20} Pursuant to the inspection contingency clause of the purchase contract, the Gentiles hired ProCheck to conduct a home inspection. The inspection was conducted on November 10, 2001, and was unlimited in both scope and duration. The Gentiles and Mrs. Gentile's father were present during the entire inspection, which lasted between four and five hours. The Gentiles were provided the opportunity to ask the inspector any questions they had about the property.

{¶ 21} When questioned about possible sources of the damage to the cabinet adjacent to the north fireplace, the inspector opined that the damage could have been caused either by water leaking down through the chimney or by some type

of insect, and he urged them to further investigate the problem. The inspector also opined that the area beneath the deck in the back of the house should be regraded to prevent future water problems in the basement. The inspector also noted that the ridge vents in the roof were not opened adequately to permit proper ventilation of the attic and that neither of the home's chimneys had "crickets" on them. The inspector explained that crickets, or saddle flashing, would provide proper water drainage off the areas of the roof near the chimneys and that the lack of crickets on the chimneys could potentially result in water leaking around the chimneys. The inspector also raised a potential problem with water in the basement directly beneath the north fireplace. The inspector also told the Gentiles that the electrical box in the basement was overloaded and needed to be separated.

{¶ 22} In the written report completed the day of the inspection, the inspector rated the "Grading at House" as "Poor." His written comments indicated that water pooling under the deck at the back of the house caused pressure on the basement wall and was the probable cause of basement leaks. The inspector recommended that the land around the foundation be sloped away from the house at a minimum of one inch per foot for a distance of six feet so that water would not pool near the back of house. The inspector rated both chimneys as "Fair" and commented that the metal chimney caps were rusted and should be painted.

{¶ 23} In the "Interior" section of the report, the inspector indicated that repairs had been made to correct water damage to the ceiling of the east front bedroom. The report further indicated that repairs had been made to correct water damage to the east wall of the living room, but that cracks were visible in the repaired area. The inspector noted that the cabinet on the north wall of the family room had been damaged "by water and probably wood eating insects." He further commented that "damage to wall behind cabinet [was] probable."

{¶ 24} In the "Attic/Crawl Space" portion of the report, the inspector rated the "Roof Framing" as "fair," commenting that there was water damage to the rafters and sheathing at the east-end chimney. The inspector rated the "Ventilation" as "Poor," and commented that the attic fan had been removed and ridge vents installed, but the sheathing was not slated to accommodate the ridge vent. In the "Basement/Slab" section of the report, the inspector noted that the "Moisture Conditions" were "Damp" and that there were visible water stains. The inspector commented that the probable cause of water stains in the wood paneling and carpet in the west end of the basement was the absence of grading away from the house under the deck.

{¶ 25} Following the inspection, the Gentiles informed Mr. Totonis that they wanted out of the contract due to the number and scope of problems with the home. At Mr. Totonis's urging, the Gentiles met with Mr. Ristas on November

12, 2001, to voice their concerns. Mr. Ristas had been provided a copy of the inspection report, and the Gentiles were free to discuss all aspects of the report.

{¶ 26} At the meeting, the Gentiles raised concerns about possible water problems caused by the lack of crickets on the north chimney. According to Mr. Gentile, Mr. Ristas averred that he had never had problems with the roof before discovering a leak in the roof, that he had let the leak go too long, and that he had just put a very expensive new roof on the house which solved the problem. The Gentiles also expressed concern that if the damage to the cabinet on the north wall of the family room was so extensive that the cabinet would have to be replaced, the wall behind it might crumble. According to Mr. Gentile, Mr. Ristas acknowledged that water leaking from the chimney pooled in the bottom of the cabinet, causing the wood to rot, and was one of the reasons he replaced the roof. Mr. Ristas further averred that there was no problem with the north wall in the family room; however, he indicated that he would arrange for an engineer to assess the structural integrity of the wall.

{¶ 27} The Gentiles also expressed concerns about the wet carpet and moisture in the basement and the grading problems under the deck. Mr. Ristas responded that he had never had any problem with water in the basement, but offered to regrade the area underneath the deck in accordance with the home inspector's recommendation. Mr. Ristas also attributed the basement's musty odor to the fact that the house had been vacant and closed up for several months.

{¶ 28} The Gentiles also voiced concerns about potential problems with the south chimney and adjoining wall; Mr. Ristas averred that the south chimney had never leaked. When Mr. Gentile asked about a crack in one of the bedroom walls, Mr. Ristas stated that there were never any leaks in the bedrooms, that the only problem with leaks was with the north chimney, and that those problems had been alleviated through installation of the new roof. With regard to the Gentiles' concerns about electrical system problems, Mr. Ristas stated that he would bring in professionals to rectify any problems noted in the inspection report.

{¶ 29} In an effort to allay the Gentiles' concerns, Mr. Ristas hired three separate contractors—New Wave to correct the electrical problems, Buckeye to regrade the area under the deck, and Criterium to assess the structural integrity of the north wall and adjoining chimney. Further, pursuant to the termite inspection contingency clause in the purchase contract, the Gentiles hired Quality Pest to inspect the home for termites. The inspection was conducted on November 13, 2001, and the inspector prepared a detailed report of his findings. The inspector reported no visible evidence of termites; however, the inspector noted visible evidence of termite galleries on a shelf beside the north fireplace and on a shelf in the basement directly beneath the north fireplace. The

inspection report warned that "[a]ctivity and need for treatment cannot be determined without further investigation." Based upon these findings, Mr. Ristas, on November 27, 2001, contracted with Quality Pest to treat the home for termites at his expense.

{¶ 30} Thereafter, relying on Mr. Ristas's assertion that the contractors he hired would resolve the problems identified in the inspection report, and without requesting documentation from any of the contractors concerning the work they performed, scheduling a second home inspection, or seeking an extension of the closing date set for December 10, 2001, the Gentiles, in conjunction with their decision to rent the Ristas home for a few days prior to the closing, executed a document on December 6, 2001, expressing satisfaction with the condition of the property and the repairs made by Mr. Ristas and purporting to release Mr. Ristas from any further obligation or claims against him with regard to any future repairs and/or the condition of the property.

{¶ 31} A few days before the closing, Mr. Totonis called the Gentiles with the results of the termite inspection. According to Mr. Gentile, Mr. Totonis stated that the inspector found evidence that there had probably been termites in the home, but there was no cause for alarm because there was no visible evidence of live termites and Mr. Ristas was purchasing a termite-abatement system. The Gentiles were not provided, nor did they request, a copy of the termite-inspection report prior to closing; however, they were provided a copy of the report at the closing. Mr. Gentile testified that he signed the report without reading it.

{¶ 32} Within five months after the closing, the Gentiles experienced several problems with the home, including separation of both chimneys from the structure, structural failures and wall deterioration in the main floor family room, water leaks and toxic black mold behind the finished walls of the basement recreation room, an insufficient electrical system, and live termites and extensive termite damage contiguous to the north chimney and in the basement recreation room. The Gentiles also discovered that Mr. Ristas had repaired roof leaks near each of the two chimneys and in the foyer area prior to replacing the roof.

{¶ 33} In addition to Mr. Gentile's deposition testimony and related exhibits, Mr. Ristas further supported his summary judgment motion with his own affidavit, in which he averred that he had lived in the Gavington Court home from May 1990 to February 2000; that he had no knowledge of any termite infestation and never saw what he recognized to be a termite swarm or an insect he recognized to be a termite during the time in the lived in the home; that he had no knowledge of basement leaks prior to the ProCheck inspection on November 10, 2001; that he was aware of limited dampness in the northeast corner of the basement directly below the north fireplace; that to the best of his knowledge, a roof leak caused water to run down the north chimney onto the basement carpet;

that he showed and explained the damp area to Mrs. Gentile prior to the closing; and that to the best of his knowledge, the new roof installed in 2001 remedied the problem. He further averred that he did not conceal any defect from the Gentiles or make any misrepresentations to them about the condition of the home and never intended to mislead the Gentiles as to the true condition of the home.

{¶ 34} Mr. Ristas argued in his summary judgment motion that the Gentiles' claims were barred by the December 6, 2001 release of claims and/or the doctrine of caveat emptor. Alternatively, Mr. Ristas argued that no genuine issues of material fact existed with regard to the Gentiles' claims and that he was entitled to judgment as a matter of law on each of those claims.

{¶ 35} The Gentiles filed a response to Mr. Ristas's motion for summary judgment supported by their own affidavits and depositions, the depositions of Mr. Ristas and Mr. Totonis, and the affidavits of Conrad Fuchs, the ProCheck home inspector, expert mold analyst Shannon Landrum, contractor Steve Roof, structural engineer William Shepherd, Ohio State University entomologist George Keeney, Barbara Lach, a realtor who listed the Ristas property in June 2000, and contractor Keith Lynn. Those summary judgment materials provide the following pertinent facts in addition to those established by Mr. Ristas's summary judgment materials.

{¶ 36} Mr. Ristas testified that sometime prior to 1997, a heavy rainstorm caused a small roof leak in the front foyer area of the house; the leak was repaired and the area repainted through an insurance claim. Several years later, he noticed some water damage to the back of the cabinet adjacent to the north fireplace and some dampness in the corner of the basement directly beneath the north fireplace. He contacted Feazel to inquire about possible sources of the dampness and water damage; Feazel opined that the two were related and could be remedied by replacing the roof. Feazel replaced the roof in August 2001. Thereafter, Mr. Ristas had no further problem with roof leaks.

{¶ 37} Sometime between November 1998 and February 2000, Mr. Ristas noticed a small stain on the ceiling above one of the bedroom walls that connected to the chimney. Although the stain was dry to the touch, he identified it as a water stain. He cut into the drywall, removed the stained area, patched the drywall, and painted over it. He testified that he was satisfied that his efforts remedied the problem and did not disclose the repair on the property disclosure form because he felt it was "inconsequential."

{¶ 38} Mr. Ristas testified that his failure to answer the question on the disclosure form regarding the roof leaks was an oversight, but pointed out that he had disclosed that the roof was to be replaced the next month. He also averred that his failure to answer the question regarding termites was most likely due to an oversight. He further testified that his negative response to the question

about basement water leaks, damage, or dampness was based upon his belief that the new roof remedied any problems with moisture in the basement.

{¶ 39} Mr. Ristas further testified that he directed the various contractors, either personally or through Mr. Totonis, to perform whatever work was necessary to satisfy the problems noted in the ProCheck report. He further testified that between the time the contractors completed their work and the closing, the Gentiles never complained about the work performed, never requested an extension of the closing, never demanded further inspections, and never indicated that they wanted to cancel the purchase contract.

{¶ 40} Ms. Landrum testified by affidavit that on August 30, 2002, she obtained air and surface samples from the Gavington Court property and on September 23, 2002, prepared a "Biological Contamination Assessment Report," which included findings and conclusions related to those samples. Ms. Landrum's report indicated that the Gentiles requested the biological-contamination inspection after observing mold growth during construction activities associated with repairing damage caused by termite infestation. The report further indicated that visible mold growth caused by water intrusion was discovered on the west wall of the basement and the drywall on the north wall in the living room, causing extensive mold contamination in the residence.

{¶ 41} Mr. Roof testified by affidavit that on May 20, 2002, he inspected the wall adjacent to the north fireplace in the family room, the chimney outside the family room, and the basement recreation room directly below the family room for termite damage and prepared a report that included findings related to that inspection. Findings related to the family room indicated that the cabinet adjacent to the fireplace and the floor joists and subfloor had been severely damaged by termites and that the chimney had been leaking for some time, causing damage to the fireplace insert. Mr. Roof further reported that the chimney was cracked and had shifted, most likely due to the termite damage in the area, and recommended that the existing chimney be demolished and rebuilt. With regard to the basement recreation room, Mr. Roof reported significant termite damage to the ceiling drywall and considerable moisture damage and attendant mold in the wall paneling and drywall. Mr. Roof opined, based upon the amount of mold discovered, that the excessive moisture problem had been long-standing.

{¶ 42} Mr. Keeney testified by affidavit that he conducted a termite inspection on July 16, 2002, and July 22, 2002, and prepared a report of his findings on August 12, 2002. Mr. Keeney's inspection revealed active termite infestation inside the home in the area around the north fireplace in the family room and in the basement, and in the exterior of the house around the north chimney. Mr. Keeney also found evidence of termite damage to the cabinet adjacent to the

north fireplace, the west walls of the basement, and the joints and subflooring in the exposed ceiling area. Mr. Keeney opined that the termite infestation had begun at least six years prior to his inspection and should have been apparent to the previous homeowners.

{¶ 43} Mr. Shepherd testified by affidavit that he inspected the home on July 16 and 30, 2002, and prepared a report of his findings on August 13, 2002. Mr. Sheperd reported that water- and termite-damaged first-floor joists, plywood, and studs adjacent to the family room fireplace were unable to support the code-required loads, and that the family room fireplace chimney was unstable.

{¶ 44} Ms. Lach provided a copy of the property disclosure form completed by Mr. Ristas in conjunction with the June 2000 listing wherein he disclosed that a chimney flashing leak had been detected and that he was making appropriate repairs.

{¶ 45} Mr. Lynn testified by affidavit that in the process of painting an area near the south chimney for the Gentiles in the summer of 2003, he discovered that a portion of the ceiling drywall had been cut out, replaced, and painted over. In the same area, he found several water spots caused by water leaks in the roof.

{¶ 46} In their memorandum opposing Mr. Ristas's motion for summary judgment, the Gentiles argued that Mr. Ristas misrepresented, failed to disclose, and concealed information about previous roof and chimney leaks, termite infestation, and water problems in the basement. The Gentiles argued that their claims were not barred by the December 6, 2001 release because it was procured by mutual mistake and fraud, was not supported by consideration, and was illegal. The Gentiles also contended that their claims were not barred by the doctrine of caveat emptor.

{¶ 47} The trial court concluded that genuine issues of material fact existed regarding the validity of the December 6, 2001 release and, accordingly, denied summary judgment to Mr. Ristas on that affirmative defense. However, the trial court concluded that no evidence demonstrated that Mr. Ristas had engaged in fraud in the sale of the property, and, therefore the Gentiles' claims could not be maintained by application of the doctrine of caveat emptor. Accordingly, the trial court granted summary judgment in favor of Mr. Ristas.

{¶ 48} As noted previously, the Gentiles raised claims against Mr. Ristas for fraudulent misrepresentation, fraudulent concealment, fraudulent inducement, breach of contract, and unjust enrichment. The trial court addressed the fraud claims collectively and did not specifically address the breach-of-contract or unjust-enrichment claims. The Gentiles have not asserted error in the trial court's failure to separately address those claims. In accordance with App.R. 12(A)(2), this court will not address them.

{¶ 49} The doctrine of caveat emptor applies to real estate transactions in Ohio and limits the ability of claimants to raise allegations of fraud or misrepresentation related thereto. *Parahoo v. Mancini* (Apr. 14, 1998), Franklin App. No. 97APE08–1071, 1998 WL 180539. Generally, the doctrine governs the obligation of sellers of real property to disclose information to potential buyers and precludes any reliance on certain misrepresentations made by a seller or sellers concerning the condition of the property at issue. Id.

{¶ 50} Under the doctrine of caveat emptor, a seller has an obligation to disclose only those defects known by the seller that could not be readily discoverable by a reasonable inspection. Id. In *Layman v. Binns* (1988), 35 Ohio St.3d 176, 177, 519 N.E.2d 642, the Ohio Supreme Court noted that "[a] seller of realty is not obligated to reveal all that he or she knows. A duty falls upon the purchaser to make inquiry and examination." Moreover, the doctrine states that a party has no right to rely on certain representations regarding the property to be transferred when the true facts are equally open to both parties. *Parahoo,* supra. Thus, "[t]he doctrine of caveat emptor precludes recovery in an action by the purchaser for a structural defect in real estate where (1) the condition complained of is open to observation or discoverable upon reasonable inspection, (2) the purchaser had the unimpeded opportunity to examine the premises, and (3) there is no fraud on the part of the vendor." *Layman,* at syllabus.

{¶ 51} The elements of fraud are (1) a representation or, when there is a duty to disclose, concealment of a fact, (2) which is material to the transaction at hand, (3) made falsely, with knowledge of its falsity, or with such utter disregard as to whether it is true or false that knowledge may be inferred, (4) with the intent of misleading another into relying upon it, (5) justifiable reliance on the representation or concealment, and (6) an injury proximately caused by that reliance. *Williams v. Aetna Fin. Co.* (1998), 83 Ohio St.3d 464, 475, 700 N.E.2d 859. Fraud may be committed not only by affirmative misrepresentation or concealment, but also by nondisclosure when there is a duty under the circumstances to disclose. *Parahoo,* supra. The elements of fraudulent inducement are essentially the same as those for fraudulent misrepresentation, fraudulent concealment, and fraudulent nondisclosure. *Information Leasing Corp. v. Chambers,* 152 Ohio App.3d 715, 2003-Ohio-2670, 789 N.E.2d 1155, at ¶ 84; *Harrel v. Solt* (Dec. 27, 2000), Pickaway App. No. 00CA027, 2000 WL 33226302.

{¶ 52} The Gentiles argue that Mr. Ristas misled them by failing to accurately complete the statutory property disclosure form and by otherwise failing to disclose material defects in the property, i.e., previous roof and chimney leaks and attendant repairs, termite infestation and concomitant structural damage, and basement dampness resulting in mold contamination and structural damage.

{¶ 53} R.C. 5302.30 requires a seller of residential property to complete and deliver to each prospective purchaser a property disclosure form disclosing various "material matters relating to the physical condition of the property" and "any material defects in the property that are within the actual knowledge of the transferor." R.C. 5302.30(C) and (D). The statute also requires that any disclosures be made in "good faith," which is defined as "honesty in fact." R.C. 5302.30(E)(1) and (A)(1). A seller's failure to disclose the information required by the disclosure form does not necessarily mean that the seller has committed fraud; however, when the seller intentionally fails to disclose a material fact on the disclosure form with the intention of misleading the buyer, and the buyer relies upon the disclosure form, the seller is liable for any resulting injury. *Juan v. Harmon* (Mar. 5, 1999), Hamilton App. No. C–980587, 1999 WL 110696.

{¶ 54} With respect to roof and chimney leaks, the Gentiles contend that Mr. Ristas misled them by failing to answer the question on the disclosure form concerning current leaks. As previously noted, however, Mr. Ristas did disclose in the follow-up question that a new roof was to be installed in August 2001. Because a seller is required to answer the follow-up question only if the seller knows of current leaks or problems with the roof, Mr. Ristas's disclosure of the roof replacement would put a reasonable person on notice of potential leaks or other problems with the roof and chimneys. Further, the evidence submitted in support of and in opposition to the motion for summary judgment does not support a reasonable inference that Mr. Ristas failed to disclose current roof and chimney leaks. Mr. Ristas averred that no leaks occurred after the roof was replaced in August 2001.

{¶ 55} The Gentiles also claim that Mr. Ristas misled them by failing to answer the question on the disclosure form concerning past roof and chimney leaks. Specifically, the Gentiles claim that Mr. Ristas failed to disclose (1) the 1997 repair made to the roof leak in the front foyer area, (2) the repair he and his brother made to a roof leak near the north chimney between 1998 and 2000, and (3) his detection of a chimney flashing leak he had previously disclosed when he listed the home with another realtor in June 2000.

{¶ 56} Without question, Mr. Ristas was required to disclose these past problems with the roof and chimney. However, this court finds no evidence in the record from which reasonable minds could conclude that Mr. Ristas intended to mislead the Gentiles into relying upon any nondisclosure, misrepresentation, or concealment of these past problems or that they justifiably relied upon any nondisclosure, misrepresentation or concealment related thereto. Mr. Ristas averred in his affidavit that he never intended to mislead the Gentiles as to the condition of the home. Further, Mr. Ristas stated that it never occurred to him to disclose the ceiling repair because the repair was minor and he was satisfied

that the repair remedied any problems. He further testified that the roofing companies he contacted about replacing the roof assured him that a new roof would solve water problems in the house.

{¶ 57} Further, the Gentiles had ample notice of past problems with roof and chimney leaks from Mr. Ristas's verbal disclosures. When Mr. Ristas met with the Gentiles after the home inspection, he admitted that the roof had leaked in the past, that he let the leaks go on longer than he should have, and that he replaced the roof in order to solve the problems. He also reported that a chimney leak had caused damage to the cabinet in the family room and explained that the situation was one of the reasons he replaced the roof.

{¶ 58} In addition to Mr. Ristas's disclosures, the inspection report also alerted the Gentiles to past roof and chimney problems. As noted previously, the report indicated that repairs had been made to correct water damage to the bedroom ceiling and the east wall of the living room and that cracks were visible in the repaired area. The report also noted water damage to the rafters and sheathing at the east end chimney. In addition, the inspector opined that the damage to the cabinet in the family room could have been caused by water leaking down the chimney. The inspector also opined that the absence of crickets on the chimney could result in water leaking around the chimney. The inspection report also indicated possible structural damage to the wall behind the cabinet caused by chimney leaks.

{¶ 59} With respect to the termite infestation, the Gentiles contend that Mr. Ristas misled them by failing to answer the question on the disclosure form regarding the presence of termites or any existing termite damage. The Gentiles also contend that Mr. Ristas affirmatively represented that the properly had no termites and failed to disclose that he had painted the inside of the cabinet in the main floor family room, presumably to conceal termite damage.

{¶ 60} This court finds no evidence in the record from which reasonable minds could conclude that Mr. Ristas intended to mislead the Gentiles into relying upon any nondisclosure, misrepresentation, or concealment of termite infestation or damage. Mr. Ristas testified by affidavit that he had no knowledge of termite infestation in the home, never saw what he recognized to be a termite swarm, and never saw an insect he recognized to be a termite while he lived in the home. He further stated in his deposition that he had no knowledge of anyone painting over damage to the inside of the cabinet.

{¶ 61} The Gentiles claim that Mr. Keeney's affidavit establishes that Mr. Ristas committed fraud with respect to the termite infestation and damage. The Gentiles point specifically to Mr. Keeney's opinion that the termite infestation should have been apparent to the previous homeowner. Mr. Keeney's statement does not, however, create an issue of fact as to fraud. In *Yahner v. Kerlin,*

Cuyahoga App. No. 82447, 2003-Ohio-3967, 2003 WL 21714917, a case in which the plaintiffs-buyers supported their assertion that the defendant-seller committed fraud with an expert affidavit that stated that the defendant-seller "should have known" of the existence of water leaks in the basement, the court stated, at ¶ 30:

> A finding of fraud requires proof that [the seller] had actual knowledge of the alleged defect and purposely misrepresented or concealed it. The expert's opinion that defendant "knew" of the alleged defect is without foundation. Whether defendant "should have known" is an issue that would be relevant only in a negligence determination. It is not probative of [the seller's] actual knowledge and is irrelevant to a determination of fraud.

Similarly, Mr. Keeney's opinion that the termite infestation should have been apparent to Mr. Ristas is not probative of Mr. Ristas's actual knowledge and is irrelevant to a determination of fraud.

{¶ 62} Finally, even if the evidence, construed in favor of the Gentiles, could raise a reasonable inference that Mr. Ristas intentionally misrepresented or concealed the presence of termites or termite damage in the home, the Gentiles could not have justifiably relied on any such misrepresentation or concealment given their ample notice of potential termite problems. The ProCheck home inspector told the Gentiles that the damage to the cabinet in the family room might have been caused by termites and urged them to further investigate the source of the problem. He reiterated his opinion in the inspection report. Further, the Quality Pest termite inspection report noted visible evidence of a wood-destroying insect infestation based upon the presence of termite galleries. The report warned that termite activity and the need for treatment could not be assessed without further investigation. Prior to closing, Mr. Totonis informed the Gentiles that the inspection report revealed evidence of past termite problems and that Mr. Ristas was purchasing a termite-abatement system as recommended by Quality Pest. The Gentiles did not request a copy of the termite report prior to the closing. While they were provided a copy of the report at closing, Mr. Gentile signed the report without reading it. Mrs. Gentile read and signed the report, apparently without questioning its contents.

{¶ 63} Finally, with respect to water problems in the basement, the Gentiles contend that Mr. Ristas failed to disclose that the August 2001 roof replacement was needed, in part, due to dampness in the basement and affirmatively misrepresented that there had never been water in the basement. According to his affidavit testimony, which is undisputed, Mr. Ristas showed Mrs. Gentile a damp area in the basement and explained that it was caused by a roof leak. Further, as mentioned, nondisclosure of defects does not rise to the level of fraud unless the defects are not discoverable through reasonable inspection. *Layman*, 35

Ohio St.3d at 177, 519 N.E.2d 642. The evidence in this case, construed in favor of the Gentiles, establishes that the basement water problems were discoverable upon reasonable inspection. During their initial visits to the home, the Gentiles observed that the basement smelled damp and musty. They also observed that a portion of the basement carpet was wet. Further, the home-inspection report noted dampness in the basement as well as visible water stains in the wood paneling and carpeting. Having been put on notice of potential water problems in the basement, the Gentiles could not have justifiably relied on Mr. Ristas's alleged nondisclosures and misrepresentations.

{¶ 64} The evidence in support of and in opposition to Mr. Ristas's motion for summary judgment establishes that the Gentiles' claims are barred by the doctrine of caveat emptor. All of the defects the Gentiles complain about were either observed by the Gentiles themselves during their visits to the home or were discovered and reported by the home inspector or the termite inspector. Further, the undisputed evidence reveals that the Gentiles had an unimpeded opportunity to inspect the entire premises, both during their initial visits with Totonis and during the extended ProCheck inspection. Finally, the Gentiles have not met their burden of demonstrating that Mr. Ristas intentionally failed to disclose, misrepresented, or concealed the condition of the property for the purpose of defrauding the Gentiles. Accordingly, the first assignment of error is overruled, rendering the second assignment of error moot. See App.R. 12(A)(1)(c).

B. Claims against Criterium (case No. 04AP–647).

{¶ 65} In their complaint, the Gentiles raised three claims against Criterium: (1) breach of contract, (2) negligence, and (3) misrepresentation. The breach-of-contract claim alleged that "[the] Gentiles as third-party beneficiaries through defendants Mr. Ristas and RE/MAX entered into a contract with defendant Criterium for the inspection of * * * water damage and structural integrity at the Property" and that Criterium breached the contract "by failing to perform its work in a reasonable and customary manner," and "[by failing] to properly disclose the existence of, and damage by, moisture, termites and wood failure." The negligence claim alleged that Criterium owed the Gentiles a duty to properly perform the agreed inspection and analysis and breached its duty by failing to properly report on the existence and extent of damage. The misrepresentation claim alleged that Criterium, knowing its representations would be relied upon by the Gentiles, both affirmatively misrepresented and failed to disclose material facts relative to the condition of the property.

{¶ 66} Criterium filed a motion for summary judgment supported by the affidavits of Don Liszkay and Nick Sung and the exhibits attached thereto. Those materials provide the following pertinent facts.

{¶ 67} Prior to November 19, 2001, Mr. Totonis, at Mr. Ristas's request, contacted Criterium and requested an inspection of the Gavington Court property. Criterium hired an independent contractor, Nick Sung, a licensed professional engineer, to conduct the inspection. According to Mr. Sung, Mr. Ristas executed an "Agreement for Services," which delineates that the inspection was a "limited structural inspection."

{¶ 68} Mr. Sung conducted the inspection on November 19, 2001, and prepared a written report of his findings. Both Mr. Totonis and Mrs. Gentile were present during the inspection. According to Mr. Sung, the inspection encompassed all matters that were brought to his attention, subject to the understanding that a limited structural inspection had been requested. The terms of the "Agreement for Services" limited the inspection to "reasonably available and visible structural components." In addition, Mr. Sung's written report noted that no destructive or invasive testing was performed. The focus of the inspection was to assess the structural integrity of the home regarding the water leakage around both the north and south chimneys.

{¶ 69} Mr. Sung testified that the cabinet adjacent to the north chimney was water-damaged along its side, back, and base and opined that the damage was caused by water leaking through the chimney. A portion of the underlying structure was exposed because some of the rotted wood had been removed. Mr. Sung averred that he observed structural damage to only a small area of the plywood subflooring and did not see any wall damage. He further averred that the floor and wall framing were in good condition with no rot damage. Given these observations, he opined that the only necessary structural repair was replacement of the small section of rotted plywood subflooring. Mr. Sung also observed water stains around the south chimney and attendant damage to the plywood roof sheeting. Mr. Sung opined that the damage was so minor that no repairs were needed.

{¶ 70} Mr. Sung attested that, based upon his training and experience, his inspection was reasonable and in accordance with Mr. Ristas's request for a limited structural inspection as defined in the "Agreement for Services." He opined that the limited inspection requested, based upon reasonably available and visible structural components, indicated that the residence was structurally sound.

{¶ 71} Criterium argued in its summary judgment motion that the Gentiles' claims were barred by a lack of privity of contract, the December 6, 2001 release

of claims, and the doctrine of caveat emptor. Criterium also argued that the record contained no facts in support of the Gentiles' claims.

{¶ 72} In response to Criterium's motion for summary judgment, the Gentiles argued, without any supporting evidence, that their claims were not barred by lack of privity of contract, as they were third-party beneficiaries of the contract between Criterium and Mr. Ristas. The Gentiles further argued that their claims were not barred by either the release of claims or the doctrine of caveat emptor. Finally, the Gentiles argued that Criterium was necessarily negligent in its inspection because the north wall subsequently deteriorated to such an extent that extensive repairs were necessary to the wall, chimney, understructure, and cabinet.

{¶ 73} The trial court concluded that genuine issues of material fact existed as to whether the Gentiles qualified as third-party beneficiaries to the contract between Criterium and Mr. Ristas. The court also concluded that the December 6, 2001 release of claims did not encompass the Gentiles' claims against Criterium and that the doctrine of caveat emptor was inapplicable. However, the trial court concluded that the Gentiles failed to come forward with specific facts demonstrating a genuine issue of material fact as to whether Criterium was negligent in performing its inspection and preparing its report.

{¶ 74} Initially, we note that the Gentiles now attempt to assert an argument that was not raised in their response to Criterium's motion for summary judgment. The Gentiles contend that genuine issues of material fact exist as to the nature and scope of the inspection requested by Mr. Ristas, i.e., whether the inspection requested was for a "limited structural inspection" or something more extensive. It is well settled that a litigant's failure to raise an issue before the trial court waives the litigant's right to raise that issue on appeal. *Estate of Hood v. Rose,* 153 Ohio App.3d 199, 2003-Ohio-3268, 792 N.E.2d 736, ¶ 10. "More specifically, a party who does not respond to an adverse party's motion for summary judgment may not raise issues on appeal that should have been raised in response to the motion for summary judgment." Id., quoting *Haas v. Indus. Comm.* (Dec. 21, 1999), Franklin App. No. 99AP–475, 1999 WL 1221525. Accordingly, we decline to address the Gentiles' belated argument regarding the scope of Criterium's inspection.

{¶ 75} The Gentiles' breach-of-contract and negligence claims are based upon allegations that Criterium failed to properly perform its inspection of the property. To establish actionable negligence, a party seeking recovery must demonstrate (1) the existence of a duty owed by the defendant to the plaintiff, (2) a breach of that duty, and (3) injury proximately resulting therefrom. *Parahoo,* supra. Assuming that Criterium owed the Gentiles a duty to properly conduct

the inspection, we find that the Gentiles have failed to come forward with specific facts demonstrating a genuine issue of material fact as to whether Criterium breached its duty.

{¶ 76} Construing the evidence most strongly in favor of the Gentiles, we find that Criterium discharged its initial burden of informing the trial court of the basis of its motion for summary judgment and identifying those portions of the record before the trial court that demonstrate the absence of a genuine issue of material fact on a material element of the Gentiles' claim. *Dresher*, supra, 75 Ohio St.3d at 292, 662 N.E.2d 264. As noted, Criterium submitted the affidavit of Mr. Sung, along with a copy of the agreement between Criterium and Mr. Ristas. That agreement called for a "limited structural inspection," defined as "an inspection and evaluation that is limited to reasonably available and visible structural components." In his affidavit, Mr. Sung stated that his inspection was performed in a reasonable manner and was in accordance with Mr. Ristas's request for a limited structural inspection. Further, Mr. Sung averred that the residence appeared to be structurally sound based upon reasonably available and visible structural components. Accordingly, Criterium has pointed to expert testimony that Mr. Sung properly performed Criterium's contractual duties and carried out his limited inspection properly and reasonably, free from negligence.

{¶ 77} Thereafter, the burden shifted to the Gentiles to set forth specific facts to show that there is a genuine issue for trial on their negligence claim. As noted, the Gentiles submitted no evidence in support of their motion for summary judgment. Rather, the Gentiles make conclusory allegations that Criterium was negligent in its inspection based on subsequent deterioration and necessary repairs to the north wall, chimney, understructure, and cabinet. The Gentiles point to no evidence contradicting Mr. Sung's testimony that the residence appeared structurally sound based upon reasonably available and visible structural components. The Gentiles also point to no evidence contradicting Mr. Sung's testimony that he performed his inspection of the residence in a reasonable manner and in accordance with Mr. Ristas's request for a "limited structural inspection." Accordingly, we find that the Gentiles have not satisfied their reciprocal burden as the nonmoving party to identify evidence to demonstrate that any genuine issue of material fact must be preserved for trial for the Gentiles' breach-of-contract and negligence claims. Thus, we find that those claims fail as a matter of law.

{¶ 78} Although not identified as such, it is clear from the Gentiles' complaint and filings that their "misrepresentation" claim is one for negligent misrepresentation rather than fraudulent misrepresentation. A person liable for negligent misrepresentation is defined as " '[o]ne who, in the course of his business, profession or employment, or in any other transaction in which he has a

pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their *justifiable reliance* upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.'" (Emphasis sic.) *Delman v. Cleveland Hts.* (1989), 41 Ohio St.3d 1, 4, 534 N.E.2d 835, quoting 3 Restatement of the Law 2d, Torts (1965) 126–127, Section 552(1). Liability for negligent misrepresentation is based upon the actor's negligence in failing to exercise reasonable care or competence in supplying accurate information. *Marasco v. Hopewell,* Franklin App. No. 03AP–1081, 2004-Ohio-6715, 2004 WL 2895973, at ¶ 53. A representation made with an honest belief in its truth may still be negligent because of a lack of reasonable care in ascertaining the facts, or in the manner or expression, or absence of the skill and competence required by a particular business or profession. Id. Whether or not an actor used reasonable care in obtaining or communicating information is a question for the jury, unless the facts are so clear as to permit only one conclusion. Id.

{¶ 79} We first note that the Gentiles' complaint alleged that Criterium failed to disclose material facts about the condition of the premises. A claim for negligent misrepresentation does not lie for omissions; rather, there must be an affirmative false statement. *Leal v. Holtvogt* (1998), 123 Ohio App.3d 51, 62, 702 N.E.2d 1246. Thus, any alleged failure by Criterium to disclose material facts about the property could not support a claim of negligent misrepresentation.

{¶ 80} However, the Gentiles' complaint also alleged that Criterium affirmatively misrepresented material facts about the condition of the residence. On that claim, Criterium again points to Mr. Sung's testimony that he conducted his inspection and communicated information derived from that inspection in a reasonable manner in accordance with the request for a limited structural inspection. To survive summary judgment, the Gentiles must identify evidence demonstrating a genuine issue of material fact as to whether Mr. Sung failed to exercise reasonable care or competence in obtaining or communicating the information within the scope of a limited inspection. "Proof of the standard of care and competence that a business or profession requires must necessarily be provided through expert testimony unless the lack of skill or care is so apparent as to be within the comprehension of laymen and requires only common knowledge and experience to understand and judge it." *Dickerson Internationale, Inc. v. Klockner* (2000), 139 Ohio App.3d 371, 376, 743 N.E.2d 984. The Gentiles failed to submit any evidence, let alone expert testimony, to rebut Mr. Sung's testimony that he exercised reasonable care in providing inspection services for a limited structural inspection of the residence and in reporting the results thereof. Thus, we find that the Gentiles have not satisfied their reciprocal burden as the nonmoving party to identify specific evidence to demonstrate that any genuine

issue of material fact must be preserved for trial on their negligent misrepresentation claim. Accordingly, the assignment of error is overruled.

C. Claims against Feazel (case No. 04AP–704).

{¶ 81} In their complaint, the Gentiles raised three claims against Feazel: (1) breach of contract, (2) negligence, and (3) misrepresentation. The breach-of-contract claim alleged that "[the] Gentiles as third-party beneficiaries through defendants Mr. Ristas and RE/MAX entered into a contract with defendant Feazel for the inspection of conditions associated with the roof and chimney at the Property," and that "Feazel breached the agreement by failing to perform its work in a reasonable and customary manner, and failed to properly identify remedial repairs necessary to prevent the chimney from becoming detached and leaking." The negligence claim alleged that Feazel owed the Gentiles a duty to "properly perform the agreed inspection and analysis" and that Feazel breached its duty by issuing recommendations that were "erroneous and incomplete." The misrepresentation claim alleged that Feazel, knowing its representations would be relied upon by the Gentiles, both affirmatively misrepresented and failed to disclose material facts concerning the condition of the property.

{¶ 82} Feazel filed a motion for summary judgment supported by the Gentiles' depositions. Those materials provide the following pertinent facts.

{¶ 83} The ProCheck inspection conducted on behalf of the Gentiles revealed two concerns about the roof: (1) whether a ridge vent was opened adequately to permit proper ventilation of the attic and (2) whether the use of flashing around the chimneys, without the additional use of crickets, would provide proper water drainage off those areas of the roof. Sometime after the Gentiles' meeting with Mr. Ristas, Mrs. Gentile called Feazel to inquire about the issues raised in the ProCheck inspection. A Feazel representative told her that the use of flashing around the chimneys negated the need for crickets and that the ridge vent had been adequately opened. Relying on Feazel's expertise as a roofing contractor, she did not ask Feazel to examine the roof nor did she contact any other roofing companies to assess the situation.

{¶ 84} In April 2002, the Gentiles contacted Feazel concerning excessive heat and condensation in the loft area of the house. Two Feazel employees inspected the ridge vent and concluded that it was opened adequately; however, Feazel could not determine why the ridge vent was not venting properly. Feazel ultimately replaced the ridge vent with an attic fan, which alleviated the condensation problem but did not remedy the problem with the excessive heat.

{¶ 85} In July 2002, after the north chimney separated from the house, the Gentiles called Feazel and told them that several other roofing contractors had opined that crickets were needed on the chimneys. Feazel responded that the

use of crickets on extra-wide chimneys such as those at the Gavington Court property was merely an engineering recommendation, not a requirement.

{¶ 86} Feazel argued in its summary judgment motion that the Gentiles' claims were barred by a lack of privity of contract, the December 6, 2001 release of claims, and the doctrine of caveat emptor. Feazel further contended that the record contained no facts in support of the Gentiles' claims.

{¶ 87} In response to Feazel's summary judgment motion, the Gentiles argued that their claims were not barred by lack of privity of contract, as they were third-party beneficiaries of the contract between Feazel and Mr. Ristas. The Gentiles' further argued that their claims were not barred by either the release of claims or the doctrine of caveat emptor. The trial court concluded that the Gentiles failed to establish, as a matter of law, that they were third-party beneficiaries of the contract between Feazel and Mr. Ristas to replace the roof.

{¶ 88} With regard to the Gentiles' breach-of-contract claim, we note that in Ohio, only a party to a contract or an intended third-party beneficiary of a contract may bring an action on the contract. *Mergenthal v. Star Banc Corp.* (1997), 122 Ohio App.3d 100, 103, 701 N.E.2d 383. By characterizing themselves as third-party beneficiaries, the Gentiles seemingly acknowledge that they were not actual parties to the roof-replacement contract. A review of the evidence reveals that no issue of fact exists as to whether the Gentiles were actual parties to that contract. Both Gentiles testified that the roof replacement in August 2001 was completed pursuant to a contract between Feazel and Mr. Ristas, and that they were not involved in the negotiation, execution, or payment of that contract.

{¶ 89} Thus, the issue to be resolved is whether the Gentiles were third-party beneficiaries of the contract between Mr. Ristas and Feazel for the roof replacement. It is well settled that a third person not a party to a contract has no enforceable rights under the contract unless the contracting parties intended to create such rights. *Laverick v. Children's Hosp. Med. Ctr., Inc.* (1988), 43 Ohio App.3d 201, 204, 540 N.E.2d 305. The "intent to benefit" test, adopted by the Ohio Supreme Court in *Hill v. Sonitrol of Southwestern Ohio, Inc.* (1988), 36 Ohio St.3d 36, 521 N.E.2d 780, states that "there must be evidence, on the part of the promisee, that he intended to directly benefit a third party, and not simply that some incidental benefit was conferred on an unrelated party by the promisee's actions under the contract." *TRINOVA Corp. v. Pilkington Bros. P.L.C.* (1994), 70 Ohio St.3d 271, 277–278, 638 N.E.2d 572. Moreover, "[t]here must be evidence that the promisee assumed a duty to the third party." Id. Although the third party for whose benefit the contract is made need not be identified in the contract, the third party must have contemplated by

the parties at the time of contracting. *Hines v. Amole* (1982), 4 Ohio App.3d 263, 268, 4 OBR 480, 448 N.E.2d 473.

{¶ 90} In this case, the evidence does not create a reasonable inference that Feazel and Mr. Ristas entered into the roof-replacement contract in contemplation of the Gentiles purchasing the home. It is undisputed that when Mr. Ristas contracted with Feazel to have the new roof installed, neither Mr. Ristas nor Feazel had ever met the Gentiles. The Gentiles contend, however, that they are intended third-party beneficiaries because the house was vacant, a "for sale" sign was in front of the house, and both parties, i.e., Mr. Ristas and Feazel, understood that the new roof was to be installed for the benefit of a new purchaser.

{¶ 91} Assuming, without deciding, that the evidence creates a reasonable inference that Feazel was aware when it entered into the contract that Mr. Ristas was replacing the roof in anticipation of the sale of the house, we cannot conclude that the Gentiles qualified as third-party beneficiaries of that contract. As recognized by the trial court, a case from the Second District Court of Appeals, while not precisely on point, lends guidance on this issue. In *Brewer v. H&R Concrete, Inc.* (Feb. 5, 1999), Montgomery App. No. 17254, 1999 WL 49366, the plaintiffs argued that they were intended beneficiaries of a contract between a general contractor and the subcontractors based upon the subcontractors' alleged knowledge that the house on which they were working was being constructed for the plaintiffs. The court concluded that the plaintiffs were merely incidental, not intended beneficiaries, stating: "[I]n the absence of evidence of intent, [a court] cannot infer intent on the part of the subcontractors based upon broad, conclusory assertions regarding the mere knowledge of the subcontractors regarding the ownership of the home." As noted by the trial court, the facts of this case, even more so than in *Brewer*, lead to the conclusion that the Gentiles are merely incidental, rather than intended, beneficiaries of the contract between Mr. Ristas and Feazel. As noted by the trial court, "Even more so than in *Brewer*, where the subcontractors knew the identity of the owners of the home, the instant case demonstrates that [the Gentiles] were incidental, rather than intended beneficiaries of the Feazel contract. The mere fact that some unknown purchaser would eventually benefit from Feazel's work does not convert the eventual purchase into an intended party beneficiary of Feazel's contract in the absence of evidence of intent." As in *Brewer*, no evidence supports the Gentiles' assertion that Feazel intended to benefit the Gentiles. Further, there is no allegation that Feazel expressed any intent to benefit the Gentiles or any other third party. In addition, the Gentiles did not submit evidence, by affidavit or otherwise, from a Feazel principal or employee to suggest that Feazel entered into contract with the intent to benefit the Gentiles. As in *Brewer*, in the absence of evidence of

intent, this court will not infer intent by Feazel based solely upon broad, conclusory assertions that Feazel understood that the roof was being replaced for the benefit of a new purchaser.

{¶ 92} Finally, to the extent the Gentiles argue that they orally contracted with Feazel to inspect the roof and chimney conditions in response to the ProCheck inspection, there is no evidence in the record to create a genuine issue of material fact as to the existence of any such contract. Mr. Gentile testified that he neither met with nor spoke to anyone from Feazel at any time prior to the closing on the house. He further testified that Feazel performed no work on the roof between the time of the ProCheck inspection and the closing. Mrs. Gentile testified that she telephoned Feazel once after learning of the results of the ProCheck inspection to discuss the chimney crickets and ridge-vent issues; however, she could not recall the date of the conversation or the name of the person with whom she spoke. She further testified that she did not ask Feazel to come to the home and inspect the roof.

{¶ 93} Accordingly, having determined that the Gentiles failed to present evidence to create a reasonable inference that the Gentiles were either parties to, or intended beneficiaries of, the roof replacement contract between Feazel and Mr. Ristas, and having further determined that the Gentiles failed to present evidence establishing a reasonable inference that a separate agreement existed between them and Feazel to conduct an inspection or analysis of the roof, we find that Feazel is entitled to summary judgment on the Gentiles' breach-of-contract claim.

{¶ 94} Feazel also contends that it is entitled to judgment as a matter of law on the Gentiles' negligence and misrepresentation claims. We construe the Gentiles' misrepresentation claim against Feazel as one for negligent misrepresentation rather than fraudulent misrepresentation.

{¶ 95} "As a general rule, if a plaintiff brings an action sounding in tort and bases his claim upon a theory of duty owed by a defendant as a result of contractual relations, he must be a party or privy to the contract in order to prevail." *Vistein v. Keeney* (1990), 71 Ohio App.3d 92, 106, 593 N.E.2d 52. If the plaintiff fails to establish that he or she is a party to a contract or in privity with a party, the plaintiff fails to establish the existence of a duty owed the plaintiff by the defendant. *Brewer,* supra, at fn. 2.

{¶ 96} Here, the Gentiles' negligence and negligent-misrepresentation claims appear to be based upon the theory that Feazel was negligent in the performance of the work it performed solely by reason of its alleged agreement with the Gentiles to inspect the roof in response to the ProCheck inspection. As we have previously determined, the record contains no evidence of any such agreement.

The only agreement with Feazel evidenced in the record is the agreement between Feazel and Mr. Ristas to replace the roof. Thus, any tort claims asserted by the Gentiles are necessarily based upon duties that allegedly arose as a result of Feazel's contractual relationship with Mr. Ristas. As noted previously, the Gentiles have failed to show that they are third-party beneficiaries of that contract. Accordingly, the Gentiles may not assert a tort claim based upon an alleged breach of duty Feazel owed solely as a result of its contractual relationship with Mr. Ristas. Accordingly, the Gentiles' two assignments of error are overruled.

{¶ 97} Having overruled all the assignments of error raised by the Gentiles in these consolidated appeals, this court hereby affirms the April 29, 2004, June 3, 2004, and July 8, 2004 judgments of the Franklin County Court of Common Pleas.

Judgments affirmed.

KLATT and SADLER, JJ., concur.

DESHLER, J., retired, of the Tenth Appellate District, sitting by assignment.