[Cite as *Seitz v. Harvey*, 2015-Ohio-122.]

IN THE COURT OF APPEALS FOR MONTGOMERY COUNTY, OHIO

| | | |
|---|---|---|
| ANDREW SEITZ, et al. | : | |
| Plaintiffs-Appellees/<br>Cross-Appellants | : | C.A. CASE NO.     25867 |
| | : | T.C. NO. 11CV6385 |
| v. | : | |
| ANNE C. HARVEY, et al. | : | (Civil appeal from<br>Common Pleas Court) |
| Defendants-Appellants/<br>Cross-Appellees | : | |
| | : | |

. . . . . . . . . .

# **O P I N I O N**

Rendered on the _____16th_____ day of _____January_____, 2015.

. . . . . . . . . .

CRAIG T. MATTHEWS, Atty. Reg. No. 0029215 and MARK W. EVANS, Atty. Reg. No. 0084953, 320 Regency Ridge Drive, Centerville, Ohio 45459
        Attorneys for Plaintiffs-Appellees/Cross-Appellants

MICHAEL P. McNAMEE, Atty. Reg. No. 0043861 and GREGORY B. O'CONNOR, Atty. Reg. No. 0077901, 2625 Commons Blvd., Beavercreek, Ohio 45431
        Attorneys for Defendants-Appellants/Cross-Appellees

. . . . . . . . . .

FROELICH, P.J.

{¶ 1}     Anne and Billie Harvey appeal from a jury verdict rendered against them for damages in the sum of $68,276 in an action for fraud.  The Harveys contend that the trial court erred by denying their motions for directed verdict and for judgment notwithstanding the verdict.  They further contend that the verdict against them is not supported by the weight of the evidence.  Andrew and Sarah Seitz have filed a cross-appeal in which they contend that the trial court erred by denying their request for a trial on punitive damages and by failing to enforce a settlement agreement between the parties.

{¶ 2}     We conclude that the trial court should have entered a directed verdict with regard to certain patent damage that was observable upon reasonable inspection as the Seitzes failed to establish justifiable reliance as required for a finding of fraud.  Further, the judgment rendered against the Harveys regarding the latent damages is that rare case in which the jury lost its way.  We find that the verdict was not supported by the weight of the evidence.  We find the denial of the Seitzes' claim for punitive damages is thus rendered moot.  Finally, we conclude that the trial court did not abuse its discretion in finding that the parties did not reach a post-trial settlement agreement.

{¶ 3}     Accordingly, the judgment of the trial court will be reversed with regard to the judgment rendered against the Harveys, and remanded to the trial court for proceedings consistent with this opinion.  The trial court's orders denying the Seitzes' motions for enforcement of the settlement agreement and for a new trial on punitive damages will be affirmed.

### I.   Facts and Course of the Proceedings

{¶ 4}     This appeal involves the sale of a residence located at 987 Laurelwood Road

in Kettering, Ohio. The home was built in 1953. In the 1990s it was owned by Bryan Cordell. Cordell placed the house on the market in 2003. He executed a Residential Property Disclosure Form as required by R.C. 5302.30. Plaintiffs' Ex. 1. Section G of that form states:

> G) WOOD BORING INSECTS/TERMITES: Do you know of the presence of any wood boring insects/termites in or on the property or any existing damage to the property caused by wood boring insects/termites?
>
> If owner knows of any inspection or treatment for wood boring insects/termites since owning the property (but not longer than the past 5 years), please describe.

{¶ 5} Cordell answered the first question in the affirmative and wrote "minor floor blemishes - no structural issues" in the space provided for comment. With regard to the second portion of that section, he wrote (although it was longer than 5 years), "house treated 1995-1997. No recurring activity since 1997. Property and remodeling efforts addressed this issue." The real estate MLS listing noted that the home had a "new kitchen." The "agent only" remarks indicate that the updates to the home, including a kitchen remodel in 1998, cost approximately $100,000. Plaintiffs' Ex. 2.

{¶ 6} Anne Harvey and her mother, Billie Harvey, purchased the property in 2003. A "wood destroying insect infestation inspection report," which was requested and signed by both Harveys on September 26, 2003, noted that there was "visible evidence of a wood destroying insect infestation." Plaintiff's Ex. 3. The hand-written note following that finding stated "old infestation on hardwood floor in bedroom." The report further noted that

there was evidence of prior treatment, and that the infestation was inactive; no treatment was recommended.

**{¶ 7}** The Harveys placed the house on the market in June 2005. At that time, they completed a residential property disclosure form on which they answered Section G regarding knowledge of woodboring insects in the negative. The home did not sell, and in November 2006, the Harveys hired a contractor to add a half-bathroom, remodel the two existing full bathrooms, and lay new tile in the kitchen. This work was completed in June 2007. The Harveys paid the contractor $47,000.

**{¶ 8}** In 2009, the Harveys purchased a new home in Springboro. They moved out of the home on Laurelwood Road in October 2009 which was placed back on the market in November 2009. The property disclosure form completed by the Harveys on November 11, 2009, again answered Section G negatively. Also, in Section A regarding the house water supply, the Harveys denied knowledge of any "current leaks, backups or other material problems with the water supply system." Plaintiffs' Ex. 12.

**{¶ 9}** The Harveys' real estate agent, Sandra Martin, staged the home during the time it was on the market. She used a sectional sofa and ottoman, which were the only furnishings left in the home by the Harveys. Additionally, she brought a "little side table; mirror, round mirror; something, little things, like a lamp." She also purchased an area rug. She used the sofa, ottoman and area rug in the living room. Martin used an "ice cream table" and a "couple chairs" in the kitchen. She later asked the Harveys for two "red leather barrel chairs" they owned to use in the kitchen by the fireplace. Martin moved the sofa around the living room a "couple times." She testified that the Harveys had no involvement

with the staging.

{¶ 10} In December 2010, Andrew and Sarah Seitz scheduled a viewing of the Laurelwood Road property with their real estate agent. They received a copy of the Residential Property Disclosure Form executed by the Harveys in November 2009. According to Mr. Seitz, they spent approximately twenty minutes touring the home. An offer was placed the same day. A Real Estate Purchase Agreement was executed on December 4, 2010. The Agreement contained an "as is" clause which provided, "[p]urchaser has examined the property and, except as otherwise stated in this Contract, is purchasing it 'as is' in its present condition, relying upon such examination as to the condition, character, utility and zoning of the property." Defendant's Ex. B. The Agreement also contained an inspection addendum permitting the Seitzes to conduct their own inspection of the residence.

{¶ 11} The Seitzes hired Pillar to Post to perform their home inspection. The inspection, which was performed by Michael Christian, lasted approximately two hours. Christian is a home inspector and a licensed termite inspector. Andrew Seitz was present for the entire inspection. Christian issued his report on December 8, 2010. The report raised concerns regarding some electrical wiring and the placement of the microwave, as well as issues with the fireplace chimney. The report also contained a "Wood Destroying Insect Inspection Report." That portion indicated that there was no visible evidence of wood destroying insects, but that drill marks outside the home indicated "past treatment for termites." No treatment was recommended.

{¶ 12} Mr. Seitz testified that, during the three times he was in the home, he

observed various imperfections and putty-filled areas of the hardwood floors, but did not really take notice of them. He also indicated that numerous damaged spots on the floor were not covered by any furnishings or carpet.

{¶ 13} Two large spots in the living room were covered by the sofa. Likewise, in one bedroom closet, some floor damage was concealed by a pink curtain on the floor. A second bedroom closet had a large tile, leftover from the earlier remodeling, on the floor. It also covered some damage. According to Christian and Seitz, they did not move any of these items and thus did not see the damage underneath them.

{¶ 14} A post-inspection agreement was executed on December 16, 2010, in which the Harveys agreed to pay the Seitzes $1,195 for chimney repairs; $325 for electrical work; and $500 for relocation of the microwave. On January 6, 2011, the Seitzes did a fifteen minute tour of the home. The closing was held on January 7, and the Seitzes began moving into the home the same day. They claimed that they immediately noticed creaking floorboards throughout the home. They also immediately experienced problems with water and sewage backups in the home.

{¶ 15} Approximately one month later, Mr. Seitz was moving a chair when his boot broke through a floorboard in the living room. He observed what he believed to be termites. On March 27, 2011, the Seitzes contacted a pest control company and the home was treated for termites. Eventually it was also determined that tree roots had grown into the clay sewer tiles, which had broken apart, causing drainage and water backup problems.

{¶ 16} On September 7, 2011, the Seitzes filed a complaint alleging fraudulent misrepresentation, fraudulent concealment, and fraudulent non-disclosure with regard to both

the sewer/plumbing and the termite issues. The Seitzes asked for compensatory and punitive damages.

{¶ 17} In July 2012, the Seitzes hired Rob Fickert to assess the termite damage and to give estimates for its remediation, as well as the repair of the sewer/plumbing problems. Fickert dismantled various areas of the home, including drywall and flooring, and found that there was substantial termite damage, but did not indicate any current infestation. Specifically, he found termite damage to the wood flooring, sub-flooring, the "sleeper system" and the wall framing.[1] He estimated that the cost for repairing the damage from termites and the sewer system would be $94,491.18.

{¶ 18} A jury trial was conducted over the course of four days in March 2013. The trial court overruled the Harveys' motion for directed verdict. At the close of all evidence, the trial court dismissed the claim for punitive damages finding that there was no proof that the Harveys' conduct was malicious. The jury found in favor of the Harveys with regard to the sewer/plumbing issues, but found for the Seitzes on all three claims for fraud regarding termites. The jury awarded compensatory damages of $68,276 to the Seitzes.

{¶ 19} On April 9, 2013, the Harveys filed a motion for judgment notwithstanding the verdict, which was overruled. On April 10, the Seitzes filed a motion for a new trial on the issue of punitive damages, which was also overruled. On June 7, 2013, the Seitzes filed a motion seeking to enforce an alleged post-trial extrajudicial settlement agreement between themselves and the Harveys. The trial court denied the motion.

---

[1]The record shows that the residence is built atop a concrete slab. The sleeper system consists of pieces of wood, similar to floor joists, laid atop the concrete slab. Sub-flooring is then attached to the wood.

{¶ 20}  The Harveys appealed the judgment against them.  The Seitzes filed a cross-appeal regarding the denial of their request for punitive damages and the denial of their motion to enforce the settlement agreement.

## II.  The Evidence Mandated the Entry of a Directed Verdict With Regard to the Patent Floor Damage Visible Upon Reasonable Inspection.   The Denial of the Motion for Directed Verdict and Judgment Notwithstanding the Verdict Was Appropriate with Regard to the Latent Damage not Visible upon Reasonable Inspection

{¶ 21}  The Harveys' first assignment of error provides:

THE TRIAL COURT ERRED BY DENYING THE HARVEYS' MOTIONS FOR DIRECTED VERDICT AND JUDGMENT NOTWITHSTANDING THE VERDICT AS TO DEFENDANTS' CLAIMS OF FRAUDULENT NONDISCLOSURE, FRAUDULENT MISREPRESENTATION AND FRAUDULENT CONCEALMENT.

{¶ 22}  The Harveys complain that the trial court did not sustain their motions for a directed verdict during trial and for judgment notwithstanding the verdict following trial.

{¶ 23}  Motions for directed verdict and judgment notwithstanding the verdict present questions of law.  *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, 972 N.E.2d 517, ¶ 25.  "Faced with the question of sufficiency through [such motions], the court must determine whether any evidence exists on every element of each claim or defense for which the party has the burden to go forward."  *Id.*  Reversal on sufficiency "requires that the conclusion of the [jury] cannot be supported by any rational view of the evidence; not just that it is suspicious."  *Gevedon v. Ivey*, 172 Ohio App.3d 567, 2007-Ohio-2970, 876 N.E.2d

604, ¶ 62 (2d Dist.), quoting *Stone Excavating, Inc. v. Newmark Homes, Inc.*, 2d Dist. Montgomery No. 20307, 2004-Ohio-4119.

**{¶ 24}** The Seitzes' complaint alleges three different types of fraud: fraudulent non-disclosure, fraudulent misrepresentation and fraudulent concealment. In order to prove fraud, the plaintiff must demonstrate the following elements, as noted by this court in *Schroeder v. Henness*, 2d Dist. Miami No. 2012 CA 18, 2013-Ohio-2767:

(1) a representation (or concealment of a fact when there is a duty to disclose), (2) that is material to the transaction at hand, (3) made falsely, with knowledge of its falsity or with such utter disregard and recklessness as to whether it is true or false that knowledge may be inferred, and (4) with intent to mislead another into relying upon it, (5) justifiable reliance, and (6) resulting injury proximately caused by the reliance.

*Id.* at ¶ 19.

**{¶ 25}** We look first at whether the Seitzes presented sufficient evidence to prove fraud and recover damages regarding the floor damage. R.C. 5302.30(C) requires sellers to act in good faith and to disclose facts regarding "material matters relating to the physical condition of the property to be transferred." It is undisputed that the Harveys did not disclose the existence of termite damage to the hardwood floors, despite the fact that the 2003 Cordell disclosure form and their 2003 termite inspection report alerted them to such damage. There was no evidence that the Harveys remediated any existing damage to the floors. We thus conclude that this damage should have been disclosed. "A variance between the owner's representations and the truth of the matters concerned may be a basis for a claim of

fraud, and the seller's duty of good faith requires him to act with an honest belief or purpose in the responses he provides." *Decaestecker v. Belluardo*, 2d Dist. Montgomery No. 22218, 2008-Ohio-2077, ¶ 45. However, a failure to comply with statutory duties to disclose is not dispositive of whether the failure to disclose amounts to fraud.

{¶ 26} The Seitzes contend that the damage to the hardwood flooring was not discoverable by a typical home inspection. They base this assertion upon their inspector's testimony that a typical home inspection involves merely a visual inspection, and does not involve moving furnishings or other items found in the home such as the tile and the curtain found in the bedroom closets. Thus, they argue that without a disclosure of the termite damage, they had no way of knowing about the damage.

{¶ 27} Assuming for this assignment that this accurately characterizes a reasonable inspection, the Seitzes' argument does not take into account the fact that numerous areas of damage to the floors were not covered by any furnishings and were open and observable. As previously noted, Mr. Seitz testified that he was able to observe the areas of damage that were out in plain view. It can be inferred that the inspector, who testified that he was a licensed termite inspector, was also capable of observing the damage, despite his testimony that he did not notice any of the numerous putty-filled cracks.

{¶ 28} Indeed, the Seitzes' own evidence demonstrates the existence of multiple areas in the home with damage to the floors and other areas that had been filled with putty. For example, pictures submitted by the Seitzes indicated that there were at least five areas in the hallway with damage to the floor. Additionally, the hall closet had several areas of damage including an area with significant damage. There is no evidence that any of these

areas was covered or hidden. One of the bedrooms also had numerous areas of damage that were open and discoverable, showing considerable damage in an open area that, based upon the measuring tool used in the picture, appears to be over a foot in length.

{¶ 29} The rule of *caveat emptor* still exists in Ohio and applies "to patent defects: those which are readily discoverable to prospective purchasers on inspection." *Decaestecker* at ¶ 37. "When a plaintiff claiming fraud in the sale of property has had the opportunity to inspect the property, he is charged with knowledge of the conditions that a reasonable inspection would have disclosed." *Kramer v. Raterman*, 161 Ohio App.3d 363, 2005-Ohio-2742, 830 N.E.2d 416, ¶ 14 (1st Dist.), quoting *Nunez v. J.L. Sims Co., Inc.*, 1st Dist. Hamilton No. C-020599, 2003-Ohio-3386.

{¶ 30} We need not address whether a reasonable inspection would include moving a couch, tile, or curtain, but we note that any concealment alleged here is appreciably different from inspections that are hindered by non-moveable objects. See, *e.g. Harpest v. Parrott*, 2d Dist. Miami No. 99CA20, 1999 WL 812250, *5 (Oct. 8, 1999) (question of fact existed as to whether plumbing problems were discoverable upon reasonable inspection when access to a crawl space was hindered because the opening was nailed shut and covered by wall-to-wall carpeting.) On this record, there is no question that the majority of the areas of damage to the hardwood floors, including several extensive areas, was open to view and discoverable. Furthermore, Christian also observed evidence of prior treatment, and informed the Seitzes of the treatment. His Woodboring Insect Inspection Report submitted to the Seitzes stated that "infestation and/or damage may exist in concealed or inaccessible areas." The report further advised the Seitzes to contact the company that performed the

prior treatment in order to get "information on treatment and any warranty or service agreement which may be in place."

{¶ 31} Based on this evidence, we must conclude that the Seitzes failed to demonstrate fraud, because the evidence was insufficient to prove the required element of justifiable reliance. In other words, they were on notice that there had been previous termite damage and that there was existing damage to the hardwood floors, despite the fact that three of those areas were underneath items that they or their inspector did not move. The Seitzes, "having notice of prior termite infestation and damage to the residence, had a duty to make further inspection." *Niermeyer v. Cook's Termite & Pest Control, Inc.*, 10th Dist. Franklin No. 05AP-21, 2006-Ohio-640, ¶ 27. Thus, we conclude that the trial court erred by denying the Harveys' motion for a directed verdict on the issues of fraudulent concealment, fraudulent misrepresentation, and fraudulent non-disclosure with regard to the patent floor damage.

{¶ 32} We next address whether the Seitzes presented sufficient evidence regarding their claims of fraud relating to the latent damage discovered by Fickert. The Seitzes contend that the Harveys had knowledge of the latent damage discovered by Fickert when he removed flooring and drywall. The Seitzes contend that the evidence establishes that the Harveys were aware of the damage, because the Harveys' 2003 termite inspection placed them on notice of such damage, and because they remodeled areas of the home that were adjacent to extensive latent damage. Again, it is undisputed that the Harveys made no disclosure regarding any termite damage.

{¶ 33} The termite report signed by the Harveys in 2003 states that "[i]t should be understood that some degree of damage, including hidden damage, *may be present*."

(Emphasis added), Plaintiffs' Ex. 3. While this report did place the Harveys on notice of the possibility of damage, it does not, by itself, establish that they had actual knowledge of any hidden damage; however, the Seitzes may present circumstantial evidence to show the required knowledge or intent. *Doyle v. Fairfield Machine Co., Inc.*, 120 Ohio App.3d 192, 208, 697 N.E.2d 667 (11th Dist. 1997).

{¶ 34} The Seitzes also rely upon Fickert's testimony, which they claim clearly establishes knowledge of the latent damage. Specifically, Fickert testified that one of the remodeled bathrooms had a concrete sub-floor rather than the type of wooden sleeper system present in the remainder of the home. Additionally, the kitchen's sleeper system was newer than the sleeper system found in the rest of the residence. Fickert opined that the bathroom and kitchen sleeper systems would have been replaced only if they exhibited some sort of damage. He further opined that the kitchen had been recently replaced because the new sleeper system used pressure-treated lumber which has only been "commonly used in the last 10, 12 years." Tr. p. 498. Fickert further testified that, whoever replaced the kitchen/garage door, which he opined was not older than five years, would have noticed the adjacent termite damage. Finally, he testified that it was normal procedure for any contractor who comes across such damage to notify the homeowners.

{¶ 35} While we conclude that this evidence lacks a proper foundation, as discussed in Part III below, the evidence nevertheless was submitted to the jury for its consideration. As submitted, we find it sufficient to merit the denial of both the motion for directed verdict and the motion for judgment notwithstanding the verdict on this fraud claim for latent damages.

**{¶ 36}** The first assignment of error is sustained in part, and overruled in part.

### III. The Jury Verdict Finding Fraud Regarding the Latent Defects Damage Is Not Supported by the Weight of the Evidence.

**{¶ 37}** The Harveys' second assignment of error states as follows:

THE JURY'S VERDICT IS AGAINST THE MANIFEST WEIGHT

OF THE EVIDENCE.

**{¶ 38}** In this argument, the Harveys contend that the Seitzes failed to present competent, credible evidence that the Harveys had actual knowledge of the latent damage caused by termites. Therefore, they argue that the verdict is not supported by the weight of the evidence.

**{¶ 39}** "The manifest-weight-of-the-evidence standard of appellate review set forth in *State v. Thompkins*, 78 Ohio St.3d 380, 678 N.E.2d 541 (1997), applies in both criminal and civil cases. *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, 972 N.E.2d 517, ¶ 17–23." *Mathews v. Mathews*, 2d Dist. Clark No. 2012-CA-79, 2013-Ohio-2471, ¶ 9

**{¶ 40}** This court has stated that "a weight of the evidence argument challenges the believability of the evidence and asks which of the competing inferences suggested by the evidence is more believable or persuasive." *State v. Jones*, 2d Dist. Montgomery No. 25724, 2014-Ohio-2309, ¶ 8 - 9, citations omitted. "When evaluating whether a conviction is against the manifest weight of the evidence, the appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider witness credibility, and determine

whether, in resolving conflicts in the evidence, the trier of fact 'clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.' " *Id.*, quoting *Thompkins*, 78 Ohio St.3d at 387, 678 N.E.2d 541.

**{¶ 41}** Because the trier of fact sees and hears the witnesses at trial, we must defer to the factfinder's decisions whether, and to what extent, to credit the testimony of particular witnesses. *State v. Lawson*, 2d Dist. Montgomery No. 16288, 1997 WL 476684 (Aug. 22, 1997). However, we may determine which of several competing inferences suggested by the evidence should be preferred. *Id.* The fact that the evidence is subject to different interpretations does not render the judgment against the manifest weight of the evidence. *State v. Wilson*, 2d Dist. Montgomery No. 22581, 2009-Ohio-525, ¶ 14.

**{¶ 42}** . "[E]ven if a trial court judgment is sustained by sufficient evidence, an appellate court may nevertheless conclude that the judgment is against the manifest weight of the evidence." *Eastley*, supra at ¶ 12. "When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the weight of the evidence, the appellate court sits as a 'thirteenth juror' and disagrees with the factfinder's resolution of the conflicting evidence." *Thompkins* at 387. A judgment should be reversed as being against the manifest weight of the evidence only in exceptional circumstances. *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist. 1983). "[A] court of appeals panel must act unanimously to reverse a jury verdict on the weight of the evidence." *Eastley*, at ¶ 7. "When a court of appeals determines that a jury verdict is against the weight of the evidence, it should remand the case for a new trial." *Id.*, at ¶ 22.

**{¶ 43}** We find Fickert's testimony, outlined in Part II, above, speculative and

unpersuasive. "Fraudulent conduct may not be established by conjecture; it must be proved by direct evidence or justifiable inferences from established facts." *Andrew v. Power Marketing Direct, Inc.*, 2012-Ohio-4371, 978 N.E.2d 974, ¶ 50 (10th Dist.), quoting *Doyle* at 207, 697 N.E.2d 667. Fickert's testimony that the Harveys had actual knowledge of the damage required the jury to infer 1) that the termite damage he found in 2012 existed at the time the Harveys remodeled the home in 2006 and 2007; 2) that their contractor observed the damage; and 3) that the contractor informed them of the damage. But the record is devoid of any evidence establishing the age or onset of the latent termite damage found by Fickert. Neither Fickert, nor anyone else, provided testimony regarding how long the damage had been present. It is possible that the damage was the result of the infestation during Cordell's ownership of the home and was present prior to the remodeling done by the Harveys, as Fickert assumes; however, it is also possible that the damage was the result of a new infestation and was caused subsequent to the remodeling; five years had elapsed between the time of the Harveys' remodeling and the Fickert examination, and Mr. Seitz observed what he believed to be termites in the Spring of 2011. Fickert's testimony that the Harveys' contractor would have seen the damage lacked a proper foundation. Consequently there was no basis for Fickert's testimony that the contractor would have told the Harveys of the damage and that the Harveys had actual knowledge of the damage.

{¶ 44} "It is not permissible to draw an inference from a deduction which is itself purely speculative and unsupported by an established fact. Where an inference not supported by or drawn from a proven or known fact is indulged, and is then used as a basis for another inference, neither inference has probative value. Such a process may be described

as drawing an inference from an inference and is not allowable. At the beginning of every line of legitimate inferences there must be a fact, known or proved." *Hurt v. Charles J. Rogers Transp. Co.*, 164 Ohio St. 329, 332, 130 N.E.2d 820 (1955), quoting *Indian Creek Coal & Mining Co. v. Calvert*, 68 Ind.App. 474, 120 N.E. 709 (1918).

{¶ 45} Regardless, even if the jury concluded that the damage hidden in the walls and sub-flooring existed at the time the Harveys remodeled the home, Fickert's testimony that custom and procedure would have required the Harveys' contractor to inform them of any damage did not establish the actual knowledge required to prove fraud. Instead, Fickert's testimony was, at best, the equivalent of stating that the contractor *should have seen* the damage and *should have notified* the Harveys. This is not probative of actual knowledge. *Gentile v. Ristas*, 160 Ohio App.3d 765, 2005-Ohio-2197, ¶ 61 (10th Dist.). The Harveys testified they were not so informed and, the Seitzes did not present the testimony of the contractor hired by the Harveys to perform the remodeling in 2006 and 2007. We conclude that the record does not support a finding that the Harveys had actual knowledge of the latent damage.

{¶ 46} And, as stated above, the evidence demonstrates that the Seitzes were not justified in relying on the Harveys' disclosure or lack thereof, given that they were aware that the home had been treated for termites and that the damage to the top of the hardwood floors was open and observable in some places and discoverable upon reasonable inspection in others. Therefore, even if there was proof that the Harveys had actual knowledge of the damage, the Seitzes failed to prove the elements of justifiable reliance and injury caused by that reliance necessary to prove fraud.

{¶ 47} As noted previously, much of the evidence concerning latent damages was without proper foundation, and/or was otherwise speculative. Although the jury was permitted to consider this evidence, these same defects cause us, sitting as a "thirteenth juror," to find the evidence to be less than persuasive. Thus, we conclude that with respect to latent damages, this is that rare case in which the jury lost its way in finding that the Harveys had committed fraudulent misrepresentation, fraudulent concealment and fraudulent nondisclosure, resulting in a manifest miscarriage of justice.

{¶ 48} The Harveys' second assignment of error is sustained. As we are reversing the jury's determination with respect to latent damages, the Seitzes are entitled, upon remand, to a new trial on that issue.

## V. The Seitzes' Cross-Appeal From the Denial of Their Motion to Enforce the Settlement Agreement.

{¶ 49} The Seitzes' first assignment of error on cross-appeal states:

THE TRIAL COURT ERRED IN FAILING TO ENFORCE THE AGREED SETTLEMENT REACHED BETWEEN THE PARTIES ON MAY 22, 2013.

{¶ 50} The Seitzes argue that the trial court abused its discretion by denying their motion to enforce a settlement agreement between the parties. The Harveys contend that no settlement agreement was reached, because no formal, written settlement was executed as contemplated by the parties.

**{¶ 51}** The jury verdict was rendered on March 27, 2013. On that date, the Seitzes filed a motion for prejudgment interest. In April, the Harveys filed a motion for judgment nothwithstanding the verdict. The Seitzes then filed a motion for a new trial on punitive damages. In May, the parties began settlement negotiations.

**{¶ 52}** On May 21, 2013, counsel for the Seitzes (Craig Matthews) sent the following e-mail to counsel for the Harveys (Matthew Sorg):

> Our demand is the sum set forth in the final judgment entry dated March 27, 2013, for $68,276.00, plus interest at the statutory rate from the date of the entry, plus costs. Upon receipt of said sum we will agree to the entry of notice of satisfaction and would withdraw the plaintiffs' motion for a new trial and motion for prejudgment interest, dismiss any and all pending execution proceedings, authorize the clerk to release to the Defendants whatever sum may have been received from Chase Bank. Of course these terms are conditioned upon the defendants' agreement to withdraw their motion for JNOV and the execution of a mutual general release. In addition, to the extent possible, our clients would be willing to "dismiss" any pending claims. This demand is one time, final, non-negotiable offer and will remain open for acceptance until the close of business at 5:00 p.m. on Friday, May 24.

**{¶ 53}** In response, Sorg sent the following e-mail on May 22:

> For settlement purposes only, I would calculate the number to be $68,721.93, which represents your clients' court costs at $184.00 and statutory

interest (3% per annum for two months = $261.93). Further, are you anticipating a lump sum or are payments over a short amount of time acceptable?

**{¶ 54}** Matthews responded via e-mail on the same day as follows:

The demand anticipates a lump sum payment within a prompt period of time. Regarding interest and costs, those are matters of record and they are what they are. If your client agrees to accept in principal the demand, then we can set about the task of calculating the exact sum. But I would rather not spend time doing that if your clients are not agreeable to the concept as communicated.

**{¶ 55}** Later that day, Sorg (the Harveys' attorney) sent an e-mail to Matthews (the Seitzes' attorney) stating that the Harveys had agreed "in principal to the amount demanded (payment of the judgment amount with interest and costs)." Approximately twenty minutes later, Matthews left the following voicemail for Sorg (as transcribed for the trial court):

I just called to make sure we are on the same page, as I am understanding it, your clients have agreed to accept our settlement demand, and that the only item that remains is calculating the exact amount of interest and costs, work it out - what a reasonable, prompt payment would be; and of course, work it out - the paperwork that needs to be filed, let me know if we are in fact on the same page, or if I am not understanding things.

**{¶ 56}** On May 22, 2013, at 4:46 p.m., Sorg sent another e-mail to Matthews stating:

I am unclear as to your question. You made a demand. I suggested

specifics. You advised it was not about specifics. You wanted an answer in principle. We accepted in principle. I am ready to talk specifics when you are. I think your first demand via e-mail was a good start as to some of the back end/attendant issue. I can certainly take a stab at a settlement agreement/release.

**{¶ 57}** On May 22, 2013, at 5:08 p.m. Matthews sent the following e-mail to Sorg:

Thanks for your e-mail. It appears we have a settlement in principle. With your consent, I will notify Judge Luse of the same, advise him that papers finalizing a resolution of record will be submitted within the next few days or so, and that the parties do not see any need for the court to rule on any of the pending motions. I will also prepare an itemization of costs and interest for your review and approval. Please submit your proposed settlement agreement and release. We request a lump sum payment be received in my office within ten days of the signing of the agreement. We, therefore, suggest that your clients begin, if they have not already done so, the process of what they need to do so that can happen. I will take no further efforts to effect collection of the judgment so long as the settlement process continues to move forward with due diligence. Please confirm your consent for me to contact the court.

**{¶ 58}** Matthews then sent another e-mail to Sorg indicating that court costs totaled $498.25, and that interest on the judgment was $5.61 per diem. Sorg responded by e-mail that he was working on a draft settlement agreement. On May 23, 2013, Sorg sent an e-mail

indicating that he wanted to see the signed settlement agreement prior to disbursing any monies. That same day, Sorg received another e-mail indicating that the settlement agreement had not been prepared.

{¶ 59} On June 4, 2013, the Harveys' counsel (now Michael McNamee) prepared a draft settlement proposal containing provisions that were not mentioned previously in the e-mail and voicemail settlement negotiations. Ultimately, the parties failed to execute any settlement agreement and, on June 7, 2013, the Seitzes filed their motion to enforce the settlement agreement. The trial court denied the motion. The trial court stated, "considering the totality of all the evidence presented, the parties conditioned their oral settlement on the further execution of a written settlement agreement."

{¶ 60} In *Hamlin v. Hamlin*, 2d Dist. Darke No. 1629, 2004-Ohio-2742, at ¶ 21, this court wrote:

> When a settlement agreement is extrajudicial, it may be enforced only if a binding contract exists. *Bolen v. Young*, 8 Ohio App.3d 36, 38, 455 N.E.2d 1316 (10th Dist. 1982). "The law is clear that to constitute a valid contract, there must be a meeting of the minds of the parties, and there must be an offer on the one side and an acceptance on the other." *Noroski v. Fallet*, 2 Ohio St.3d 77, 79, 442 N.E.2d 1302 (1982). To be enforceable as a binding contract, a settlement agreement requires no more formality than any other type of contract. It need not necessarily be signed, as even oral settlement agreements may be enforceable. *Kostelnik v. Helper*, 96 Ohio St.3d 1, 3, 2002-Ohio-2985, 770 N.E.2d 58. However, "it is well established that courts

will give effect to the manifest intent of the parties where there is clear evidence demonstrating that the parties did not intend to be bound by the terms of an agreement until formalized in a written document and signed by both[.]" *Berjian v. Ohio Bell Telephone Co.*, 54 Ohio St.2d 147, 151, 375 N.E.2d 410 (1978); *see*, *also*, *Curry v. Nestle USA, Inc*., 225 F.2d 658 (6th Cir. 2000). (" 'In Ohio, when parties intend that their agreement shall be reduced to writing and signed, no contract exists until the written agreement is executed.'").

**{¶ 61}** We review the trial court's decision to grant or deny a motion to enforce a settlement agreement for an abuse of discretion. *Apple v. Hyundai Motor Corp.*, 2d Dist. Montgomery No. 23218, 2010-Ohio-949, ¶ 11. The e-mail dated May 22 sent by the attorney for the Seitzes indicated that he expected defense counsel to transmit a proposed settlement agreement with releases. The e-mails of the Harveys' counsel consistently indicated that details of the agreement would have to be worked out and put into writing. The trial court could have reasonably concluded that the parties had not come to an agreement. We cannot say this constitutes an abuse of discretion.

**{¶ 62}** The first assignment of error on cross-appeal is overruled.

## VI. The Request for Punitive Damages.

**{¶ 63}** The Seitzes' second assignment of error on cross-appeal is:

THE TRIAL COURT ERRED IN FAILING TO ORDER A NEW TRIAL ON THE ISSUE OF PUNITIVE DAMAGES.

{¶ 64}   The Seitzes contend that, because they established that the Harveys committed fraud, they were entitled to a trial on the issue of punitive damages.

{¶ 65}   Given our conclusions set forth herein, this assignment of error is rendered moot, and we need not address it.   Thus, the Seitzes' second assignment of error on cross-appeal is overruled.

## VI.   Conclusion

{¶ 66}   The Harveys' First Assignment of Error being sustained in part, their Second Assignment of Error being sustained, and the Seitzes' Assignments of Error on cross-appeal being overruled, the judgment of the trial court awarding damages to the Seitzes and against the Harveys is reversed and vacated; the trial court's order denying the Seitzes' motion for a new trial on punitive damages is affirmed; and the trial court's order denying the Seitzes' motion to enforce a settlement agreement is affirmed.   The matter is remanded to the trial court for further proceedings consistent with the opinion.

. . . . . . . . . .

HALL, J., concurs.

WELBAUM, J., concurring:

{¶ 67}   While I concur with the reversal of the trial court judgment as to damages, and otherwise concur with the disposition of this case, I write separately to express my very respectful disagreement with the conclusion that the trial court properly refused to grant a directed verdict on the fraud claim that was based on latent damage.   I believe the trial court should have granted a directed verdict in the Harveys' favor on this issue.

{¶ 68}   In discussing proof of fraud based on latent damage, our opinion first notes

that a termite report the Harveys signed in 2003 only placed the Harveys on notice of the "possibility" of termite damage. Because this would not establish the actual knowledge of hidden damage required for fraud, we considered circumstantial evidence, from which actual knowledge could be inferred. The circumstantial evidence in question is based on the testimony of Rob Fickert, who assessed the termite damage in July 2012. According to Fickert, the Harveys' contractor would not have replaced certain items during remodeling work unless the items had exhibited damage. Fickert also indicated that a contractor who encounters such damage will normally notify the homeowners. Based on this testimony, we conclude in Part II of our opinion that the trial court properly refused to grant a directed verdict in favor of the Harveys on the fraud claim that was based on latent damage.

{¶ 69} However, we then conclude in Part III of our opinion that Fickert's testimony about the time frame of the damage is "speculative and unpersuasive" and that his testimony that "the Harveys' contractor would have seen the damage lacked a proper foundation." We also note in Part III that Fickert's testimony is not probative of actual knowledge, because it only equates to saying that the contractor "should have seen the damage and *should have notified* the Harveys." (Emphasis sic.) As a result, we conclude that the record does not support a finding that the Harveys had actual knowledge of the latent damage. Based on the lack of actual knowledge and the lack of justifiable reliance and injury based on that reliance, we conclude that the jury verdict against the Harveys was against the manifest weight of the evidence.

{¶ 70} The conclusions in Part II and Part III cannot be reconciled. It is true that "the sufficiency of the evidence is quantitatively and qualitatively different from the weight

of the evidence.*" Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, 972 N.E.2d 517, ¶ 23.   Sufficiency is " ' a term of art meaning that legal standard which is applied to determine whether the case may go to the jury or whether the evidence is legally sufficient to support the jury verdict as a matter of law.' * * * In essence, sufficiency is a test of adequacy.  Whether the evidence is legally sufficient to sustain a verdict is a question of law."  *State v. Thompkins*, 78 Ohio St.3d 380, 386, 678 N.E.2d 541, 546 (1997), quoting 1433 *Black's Law Dictionary* (6th Ed.1990).   (Other citation omitted.)

{¶ 71}   In contrast, "[w]eight of the evidence concerns 'the inclination of the *greater amount of credible evidence*, offered in a trial, to support one side of the issue rather than the other. It indicates clearly to the jury that the party having the burden of proof will be entitled to their verdict, if, on weighing the evidence in their minds, they shall find the *greater amount of credible evidence* sustains the issue which is to be established before them.  Weight is not a question of mathematics, but depends on its *effect in inducing belief*.' " (Emphasis sic.)   *Thompkins* at 387, quoting *Black's* at 1594.

{¶ 72}   Although we comment that Fickert's testimony is "unpersuasive," which is consistent with a manifest weight analysis, we also state that Fickert's testimony is speculative and without foundation, which are findings consistent with insufficiency.

{¶ 73}    "An action for fraud may be grounded upon failure to fully disclose facts of a material nature where there exists a duty to speak. * * * [Therefore] a vendor has a duty to disclose material facts which are latent, not readily observable or discoverable through a purchaser's reasonable inspection."  *Layman v. Binns*, 35 Ohio St.3d 176, 178, 519 N.E.2d 642 (1988).   "Caveat emptor will not bar recovery by a purchaser when latent defects not

easily discoverable are coupled with affirmative misrepresentations or concealment." *Jacobs v. Racevskis*, 105 Ohio App.3d 1, 5, 663 N.E.2d 653 (2d Dist.1995). No affirmative misrepresentations were involved in the case before us. Furthermore, a critical part of a fraudulent concealment claim is " 'knowledge of the fact concealed.' " *Id.* at 6, quoting *Szeman v. Williams*, 2d Dist. Greene No. 90-CA-129, 1992 WL 66362, * 4 (Mar. 30, 1992). (Other citation omitted.)

{¶ 74}    I fail to see how knowledge of a concealed fact can exist where the evidence of such is speculative and lacking in a foundation. Accordingly, I very respectfully disagree with the conclusion in Part II, and conclude that the trial court should have granted a directed verdict in favor of the Harveys on any fraud claims relating to latent defects in the property. Nevertheless, because the evidence was insufficient concerning latent damages, I also agree that, at a minimum, the jury's verdict on latent damage was against the weight of the evidence, and thus, I concur with the majority's disposition of this appeal.

. . . . . . . . . .

Copies mailed to:

Craig T. Matthews
Mark W. Evans
Michael P. McNamee
Gregory B. O'Connor
Hon. James W. Luse
Hon. Richard Skelton