[Cite as *Muransky v. Miller*, 2020-Ohio-4595.]

**IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY**

| | | |
|---|---|---|
| TROY P. MURANSKY | : | |
| | : | |
| Plaintiff-Appellant | : | Appellate Case No. 28622 |
| | : | |
| v. | : | Trial Court Case No. 2016-CV-380 |
| | : | |
| MICHAEL A. MILLER, et al. | : | (Civil Appeal from |
| | : | Common Pleas Court) |
| Defendants-Appellees | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on the 25th day of September, 2020.

. . . . . . . . . . .

DWIGHT D. BRANNON, Atty. Reg. No. 0021657, KEVIN A. BOWMAN, Atty. Reg. No. 0068223 and MATTHEW C. SCHULTZ, Atty. Reg. No. 0080142, 130 West Second Street, Suite 900, Dayton, Ohio 45402
    Attorneys for Plaintiff-Appellant

RONALD J. KOZAR, Atty. Reg. No. 0041903, 40 North Main Street, Suite 2830, Dayton, Ohio 45423
    Attorney for Defendants-Appellees

. . . . . . . . . . . . .

WELBAUM, J.

{¶ 1} Plaintiff-appellant, Troy P. Muransky, appeals from a judgment of the Montgomery County Court of Common Pleas that ruled in favor of defendant-appellees, Michael A. Miller and Milzy Motorsports, LLC ("Milzy"), on the parties' competing motions to enforce their settlement agreement. Muransky claims that the trial court erred in finding that Miller and Milzy performed their duties under the settlement agreement. For the reasons outlined below, the judgment of the trial court will be affirmed.

**Facts and Course of Proceedings**

{¶ 2} In 2009, Muransky purchased a 1998 Oldsmobile Cutlass ("the vehicle") for the purpose of creating a custom race/show car. In October 2009, Muransky contacted Miller, the sole owner of Milzy, to discuss the possibility of enhancing the vehicle's performance by swapping in a larger, customized engine and installing twin turbo chargers. After talking and negotiating for some time, in 2010, the parties reached an agreement regarding the work that Miller was to perform on the vehicle. Miller provided a final quote of $35,000 for the necessary parts and labor, which Muransky allegedly paid. Miller thereafter worked on the vehicle on and off between 2010 and 2016.

{¶ 3} After a series of delays, alleged false promises, and miscommunications, the parties' business relationship became strained. As a result, on January 22, 2016, Muransky filed a complaint against Miller and Milzy alleging breach of contract, violations of the Consumer Sales Practices Act, negligence, and fraud/misrepresentation. Miller and Milzy responded by filing an answer to Muransky's complaint and a counterclaim alleging tortious interference with a contractual relationship.

{¶ 4} On July 6, 2016, the parties participated in a mediation and thereafter notified

the trial court that the case had been settled. Approximately one month after the mediation, the parties signed a formal settlement agreement. Pursuant to the settlement agreement, Muransky was to deliver his vehicle to Milzy's business premises and, within six months of the delivery, Milzy was required to "complete fabrication and installation of all items of work previously agreed upon, as described in the document entitled '1998 Oldsmobile Cutlass Drivetrain Build-Engine Swap, Manual Trans, Twin Turbo.' " Plaintiff's Exhibit 2; Defendant's Exhibit F, p. 1. Throughout the case the parties referred to this document as the "buildsheet."

{¶ 5} The settlement agreement further required Milzy to provide the agreed-upon goods and services "in a good and workmanlike manner, such that the vehicle is fully functional upon completion of the work." *Id.* In the event that Milzy did not provide the agreed-upon goods and services in a timely manner, the settlement agreement provided that Muransky would be "immediately entitled to enforce judgment against Defendant Milzy Motorsports, LLC in the amount of $45,000." *Id.* However, if Milzy did provide the agreed-upon goods and services in a timely manner, the parties agreed to file a mutual dismissal of the case.

{¶ 6} To effectuate the judgment portion of their agreement, the parties attached two signed judgment entries to the settlement agreement. One of the entries was a stipulated judgment entry awarding Muransky $45,000 to be filed if Milzy did not comply with the settlement agreement. The other judgment entry was a mutual dismissal of the case with prejudice to be filed if all terms of the settlement agreement were satisfied.

{¶ 7} The parties do not dispute that after the settlement agreement was memorialized, Muransky delivered the vehicle to Milzy's on November 14, 2016, and that

all work was to be completed by May 14, 2017. There is also no dispute that the parties later signed a written agreement extending the deadline by 30 days to June 14, 2017. According to Muransky, no further extensions were ever provided. Miller, however, claimed that Muransky granted additional extensions of time for the work to be completed. There is no dispute that Miller returned the vehicle on October 6, 2017, by shipping it to a location designated by Muransky—a body shop in Monroe, Michigan, called Line-X.

{¶ 8} On April 20, 2018, six months after Miller returned the vehicle, Muransky filed the stipulated judgment entry awarding him $45,000 for Miller and Milzy's alleged breach of the settlement agreement. In response, Miller and Milzy filed a Civ.R. 60(B) motion for relief from judgment. The trial court thereafter vacated the stipulated judgment on December 18, 2018.

{¶ 9} After vacating the stipulated judgment entry, on January 7, 2019, the trial court granted Miller and Milzy leave to file a supplemental counterclaim alleging that Muransky breached the settlement agreement by not filing the mutual dismissal. Muransky thereafter sought leave to file a supplemental complaint to allege that Miller and Milzy breached the settlement agreement by failing to perform the agreed-upon work in a timely and workmanlike manner. Following a June 27, 2019 conference, the trial court vacated its order granting Miller and Milzy leave to file a supplemental counterclaim and denied Muransky leave to file a supplemental complaint. In doing so, the trial court explained that by entering the settlement agreement, the parties had agreed to dismiss the claims that they had originally filed and were now essentially moving the court to enforce the settlement agreement in their favor. Thus, the trial court construed the parties' claims as competing motions to enforce the settlement agreement.

{¶ 10} Because the trial court found that there was an issue of fact as to whether the settlement agreement had been breached by either party, it scheduled the matter for an evidentiary hearing, which took place on September 24 and 25, 2019. Following the hearing, the trial court found that the terms of the settlement agreement did not require Miller, as an individual, to do anything. The trial court also found that Milzy did not breach the terms of the settlement agreement and that the stipulated judgment should not have been filed by Muransky. More specifically, the trial court found that Muransky waived any right to claim that his vehicle was untimely delivered because he acquiesced to additional delays following the parties' 30-day written extension. The trial court further found that Milzy substantially completed the work contemplated by the settlement agreement and that Muransky failed to establish that his vehicle sustained any damage while in Milzy's possession. As a result of these findings, the trial court entered judgment in favor of Miller and Milzy and ordered court costs to be divided equally between the parties.

{¶ 11} Muransky now appeals from the trial court's judgment, raising a single assignment of error for review.

**Assignment of Error**

{¶ 12} Under his assignment of error, Muransky contends that the trial court erred in failing to enforce the settlement agreement in his favor. According to Muransky, the testimony and evidence presented at the evidentiary hearing did not support finding that Miller and Milzy performed their duties under the settlement agreement. Specifically, Muransky claims the following three findings made by the trial court were not supported

by the evidence:

(1) Muransky waived any right to claim that his vehicle was untimely delivered by acquiescing to further delays after the 30-day written extension;

(2) Miller and Milzy substantially completed the work contemplated by the settlement agreement; and

(3) Muransky failed to establish that his vehicle sustained damaged while in Miller and Milzy's possession.

*Standard of Review*

{¶ 13} The standard of review applicable to a ruling on a motion to enforce a settlement agreement depends on the issue presented. *Al-Zubi v. Cosmetic & Implant Dental Ctr. of Cincinnati, Inc.*, 1st Dist. Hamilton No. C-190406, 2020-Ohio-3272, ¶ 7*; Wynn v. Waynesburg Rd. LLC*, 7th Dist. Carroll No. 17 CA 0921, 2018-Ohio-3858, ¶ 16; *Turoczy Bonding Co. v. Mitchell*, 2018-Ohio-3173, 118 N.E.3d 439, ¶ 15 (8th Dist.). When the issue presented is a question of contract law, appellate courts "must determine whether the trial court's order is based on an erroneous standard or a misconstruction of the law" and the standard of review is "whether the trial court erred as a matter of law" in ruling on the motion. *Continental W. Condominium Unit Owners Assn. v. Howard E. Ferguson, Inc.*, 74 Ohio St.3d 501, 502, 660 N.E.2d 431 (1996). *Accord Montei v. Montei*, 2d Dist. Clark No. 2013 CA 24, 2013-Ohio-5343, ¶ 23. However, "[i]f the question is a factual or evidentiary one, the appellate court will not overturn the trial court's finding if there was sufficient evidence to support the finding." *Al-Zubi* at ¶ 7*; Wynn* at

¶ 16; *Turoczy* at ¶ 15.  " '[I]t is within the sound discretion of the trial court to enforce a settlement agreement, and its judgment will not be reversed where the record contains some competent, credible evidence to support its findings regarding the settlement.' " *Rieger v. Montgomery Cty.*, 2d Dist. Montgomery Nos. 23877 and 23878, 2010-Ohio-4764, ¶ 4, quoting *Mentor v. Lagoons Point Land Co.*, 11th Dist. Lake No. 98-L-190, 1999 WL 1313674 (Dec. 17, 1999).  *See also Seitz v. Harvey*, 2d Dist. Montgomery No. 25867, 2015-Ohio-122, ¶ 61 (appling an abuse of discretion standard of review).

{¶ 14} In this case, the primary issue raised on appeal is whether the trial court erred in determining that Milzy performed its duties under the settlement agreement. " '[W]hen parties dispute whether their respective actions were sufficient to satisfy the terms of a settlement agreement, the trial court is presented with a question of fact to decide.' "  *Savoy Hospitality, L.L.C.* v. *5839 Monroe St. Assocs., L.L.C.,* 6th Dist. Lucas No. L-14-1144, 2015-Ohio-4879, ¶ 28, quoting *Nippon Life Ins. Co. of Am. v. One Source Mgt., Ltd.*, 6th Dist. Lucas No. L-10-1247, 2011-Ohio-2175, ¶ 17.  (Other citations omitted.)  *See also Butler Cty. Bd. of Commrs. v. Hamilton*, 145 Ohio App.3d 454, 478, 763 N.E.2d 618 (12th Dist.2001) (concluding that disputed good-faith efforts to satisfy contract conditions are factual issues).  Therefore, because we are presented with an issue of fact, we must review the trial court's decision for an abuse of discretion and determine whether there was some competent, credible evidence in the record to support the trial court's findings.

*Waiver of Time Requirement*

{¶ 15} Muransky first argues that there was no evidence supporting the trial court's

finding that he waived the provision of the settlement agreement requiring Milzy to complete the work on his vehicle within six months of Muransky delivering the vehicle to Miller/Milzy. We note that " '[w]aiver' is defined as a voluntary relinquishment of a known right." (Citations omitted). *State ex rel. Wallace v. State Med. Bd. of Ohio*, 89 Ohio St.3d 431, 435, 732 N.E.2d 960 (2000). "Whether an alleged waiver is express or implied, it must be intentional. Mere negligence, oversight, or thoughtlessness does not create a waiver." *Hicks v. Estate of Mulvaney*, 2d Dist. Montgomery No. 22721, 2008-Ohio-4391, ¶ 13, quoting *Russell v. Dayton,* 2d Dist. Montgomery No. 8520, 1984 WL 4896, *3 (May 18, 1984).

{¶ 16} At the evidentiary hearing, the testimony and evidence presented by both parties established that Muransky delivered the vehicle to Miller/Milzy on November 14, 2016, and thereafter executed a written agreement extending the six-month deadline by 30 days, making the deadline June 14, 2017. Miller/Milzy returned the vehicle on October 6, 2017, which was four months beyond the extended deadline. Other than the 30-day extension that was reduced to writing, Muransky claims that he never agreed to extend the deadline beyond June 14, 2017. However, as previously noted, the trial court found otherwise and determined that Muransky had waived the time requirement in the settlement agreement by acquiescing to additional extensions. After a thorough review of the record, we find that the trial court's finding was supported by competent, credible evidence in the record.

{¶ 17} Steven Strain, the attorney who had represented Miller/Milzy during the mediation and settlement, testified that he assisted in negotiating the 30-day written extension. Strain testified that after the 30-day extension was agreed upon, he

requested additional extensions on behalf of his client. Strain testified that every time an issue came up that required more time for the project to be completed, he contacted Muransky's counsel via e-mail or telephone and explained the issue and the need for more time. Strain testified that during each of their conversations, Muransky's counsel never indicated that Muransky did not agree to the additional extensions. Strain instead testified that his conversations with Muransky's counsel led him to believe that the requested extensions had been granted.

{¶ 18} Although Strain admitted that the additional extensions were not formally documented in a written agreement, Strain testified that the extensions were evidenced by several e-mails between himself and Muransky's counsel. The e-mails were admitted into evidence and establish that Strain corresponded with Muransky's counsel between July 2017 and September 2017. In the e-mails, Strain explained the reason for the delays and the need for more time to complete the vehicle. *See* Defendant's Exhibit F, p. 223-230. Although Muransky's counsel never expressly stated that Muransky permitted an extension past the June 14, 2017 deadline, according to Strain, Muransky's counsel never indicated that the delays were unacceptable.

{¶ 19} In an e-mail dated September 1, 2017, Strain wrote:

Obviously, [Muransky] has every right to pursue [the stipulated judgment], I'm not arguing that. I just want to voice my concern that [Miller] has worked on the car in good faith and has come out of pocket on a whole lot of expenses over and above what was agreed to in the settlement, all to try to make this thing work. I want this case to be over as badly as anyone, but I am hoping that there may be an alternative to a $45k judgment against

[Miller] after all of the effort he has made.

Plaintiff's Exhibit 12; Defendant's Exhibit F, p. 224.

{¶ 20} Following that e-mail, Muransky did not file the stipulated judgment entry. In fact, Muransky did not file the stipulated judgment entry until six months after Miller/Milzy returned the vehicle to him. Miller testified that after he completed the work and returned the vehicle, he received no complaint from Muransky and that he believed Muransky was satisfied with the work until he randomly filed the stipulated judgment in April 2018.

{¶ 21} Although Muransky specifically testified that he never agreed to extend the June 14, 2017 deadline, the trial court did not find Muransky credible. The trial court did not find Muransky credible due to the contents of some text messages that Muransky sent to Dan Harvey, a childhood friend of Muransky who allegedly worked on the vehicle after Miller/Milzy returned it to Muransky. At Muransky's behest, Harvey wrote a statement regarding what was allegedly wrong with the vehicle and prepared an invoice for repairs. *See* Plaintiff's Exhibits 4 and 5. Text messages between Harvey and Muransky indicated that Muransky had asked Harvey to state that the gauges in the vehicle did not work, that the vehicle had electrical and starting issues, and to recommend that the vehicle be tuned and tested with a dynamometer, i.e., an instrument which measures the output of an engine. *See* Defendant's Exhibit F, p. 206. After Harvey texted that he would make the foregoing statements, Muransky responded: "That's great. Really appreciate it. Hoping I bury this guy in invoices and problems, he will finally just cave as he should be out of ammo." *Id.* at 205.

{¶ 22} Given Muransky's credibility issues, his delay in filing the stipulated consent

judgment entry, the testimony of Steven Strain, and the corresponding e-mails between counsel, we conclude that there was competent, credible evidence in the record to support the trial court's finding that Muransky had acquiesced to Miller/Milzy's additional delays in completing the vehicle. That is to say, based on the aforementioned evidence, the trial court reasonably concluded that Muransky impliedly waived the time requirement in the settlement agreement and voluntarily relinquished his right to claim a breach of that provision.

*Substantial Completion of Agreed-Upon Work*

{¶ 23} For his next argument, Muransky claims that the evidence did not support the trial court's finding that Miller/Milzy substantially completed the work contemplated by the settlement agreement. There is no dispute that the work to be performed by Miller/Milzy was set forth in the "buildsheet" attached to the settlement agreement. There is also no dispute that section 2(A) of the settlement agreement provided that the "goods and services shall be provided in a good and workman like manner, such that the vehicle is fully functional upon completion of the work." Plaintiff's Exhibit 2; Defendant's Exhibit F, p. 1. Muransky argues that this portion of the settlement agreement was breached by Milzy because the vehicle had several defects and was not functional when it was delivered. Each of the defects alleged by Muransky is discussed below.

(1) Starter:

{¶ 24} Muransky first argues that the starter installed in the vehicle did not work

properly and that the vehicle would not start on the first attempt. At the evidentiary hearing, Miller testified that the factory starter that came with the vehicle was not strong enough to turn over the large engine that Muransky wanted installed. Miller testified that Muransky had him swap the vehicle's 3.1 liter engine with a 3.9 liter engine, which Miller explained was unusual and had never been done before. Harvey also testified that it was a very unusual engine.

{¶ 25} Miller testified that he had to have a starter rebuilt to accommodate the large engine. Miller testified that he engaged the services of Dayton Quality Starter to build a starter for the vehicle, but that the starter built was not strong enough. Miller testified that he then built a stronger starter himself by using parts of starters from different vehicles. Miller testified that he came up with a solution to make the starter functional, but admitted that the starter was barely strong enough to turn the engine over. Nevertheless, Miller testified that in September 2017, just prior to returning the vehicle to Muransky, he tested the vehicle on a dynamometer for 6 hours and was able to start the engine 80 to 100 times without any difficulty.

{¶ 26} Jeffrey Zachos, the owner of the body shop where Muransky had Miller deliver the vehicle on October 6, 2017, testified that on the day of the delivery, the carrier who delivered the vehicle started the vehicle and drove it into his shop. Although Zachos testified that he was not near the vehicle when it was initially started, he testified that he started the vehicle an hour after the vehicle was dropped off and moved it to another location in his shop. Zachos also testified that Muransky retrieved the vehicle a week or two after its delivery, and that during that time, he started the vehicle every day so that he could move it out of the body shop and into his business's parking lot to give him room

to work. Although Zachos claimed he had some trouble starting the vehicle, Zachos nevertheless testified that the vehicle was started and moved every day while it was at his shop.

{¶ 27} Given the testimony regarding the unusual nature of the engine and that the engine was started on the day of its delivery and several times thereafter, we find that there was competent, credible evidence for the trial court to find that the starter installed by Miller was functional and that Miller/Milzy substantially completed that part of the project.

(2) Gear Shifter:

{¶ 28} Muransky next argues that the gear shifter in the vehicle was not installed properly because it was not bolted to the floor and would move around when the driver tried to shift gears. Miller testified that the gear shifter was in this condition because Muransky advised that he wanted to mount the gear shifter himself. Miller also testified that mounting the gear shifter was not part of the work listed on the buildsheet attached to the settlement agreement. Indeed, the record indicates that mounting the gear shifter was not specifically listed on the buildsheet. Muransky, however, argues that mounting the gear shifter fell under Milzy's responsibility to install the transmission, which was listed on the buildsheet. But even if this were true, Miller testified that although it was loose and awkward to use, the gear shifter was functional and operable at the time it was delivered to Muransky. Moreover, there was no testimony in the record indicating that the gear shifter was not functional.

{¶ 29} Based on the foregoing, we find that there was competent credible evidence

for the trial court to find that Miller/Milzy was not required to mount the gear shifter and that the gear shifter was otherwise functional.

(3) Dashboard Gauges:

**{¶ 30}** Muransky also argues that the gauges on the dashboard were not connected and did not function properly.  Miller testified that Muransky provided the gauges in question and that the gauges had defects in their sensors.  Miller additionally testified that when he received the vehicle from Muransky, the gauges had been installed incorrectly and were missing necessary equipment to complete their proper installation. Miller's associate, Jonathan Rench of Midwest Parts Group, testified that he worked on the vehicle during the time in question and confirmed that Muransky had provided the gauges and that the gauges were missing parts to make them operable.  Miller testified that when he received the vehicle there was 30 inches of exposed wire hanging from the gauges and that some of the wires were grounding against contacts on the vehicle.  As a result of the grounding, Miller testified that he had to remove some of the wires, which caused some of the LED lights on the gauges to go out.

**{¶ 31}** Based on this testimony, we find that there was competent credible evidence for the trial court to find that the gauges provided to Miller/Milzy were defective at the time they were received, which prohibited their successful installation and proper functioning.

(4) Engine:

**{¶ 32}** Muransky further claims that the engine installed by Miller/Milzy ran roughly

and unpredictably, making the vehicle unsafe to drive on the road. As a preliminary matter, we note that the vehicle would have been unsafe to drive on the road regardless of whether the engine was installed correctly. This is because the vehicle had no windshield or windows installed. The window work was not part of the settlement agreement; therefore, the vehicle would not have been road-ready even after Miller/Milzy completed the required work. That said, there is no dispute that the engine installed by Miller/Milzy was operable. Multiple witnesses, including Muransky, testified to observing the vehicle running after it was returned on October 6, 2017.

{¶ 33} Miller specifically testified that the engine was installed properly and was fully functional. Miller testified that he knew the engine was fully functional because he tested it on a dynamometer for six hours in September 2017. At the evidentiary hearing, Miller provided and explained a portion of the dynamometer test results and testified that the test results showed that the vehicle was fully functional. Miller also testified that he had measured the engine's air/fuel ratio with a wideband oxygen sensor and that the ratio was proper. Miller testified that the rich fuel smell Muransky complained of was due to the vehicle not having a catalytic converter, a component that Muransky asked not to have installed.

{¶ 34} Based on the foregoing, there was competent, credible evidence for the trial court to find that the engine installed by Miller was fully functional.

(5) Melted Alternator Wire/Dead Battery:

{¶ 35} Muransky also takes issue with the fact that an alternator wire melted onto

an exhaust pipe, which caused the battery not to recharge. Miller's associate, Rench, testified that the melted rubber from the alternator wire can be removed from the exhaust pipe in a few seconds, and that the melted rubber would not harm the ceramic coating on the exhaust pipe. As for the battery, Miller testified that it was supplied by Muransky and did not recharge because it was six years old with a warranty of only two or three years. Miller testified that he tried to keep the battery alive, but could not because it charged at one amp and took an entire day to recharge.

{¶ 36} Based on this testimony, we find that there was competent credible evidence for the trial court to find that the melted wire did not affect the vehicle's functionality and that the battery did not function properly because it was defective at the time it was received.

(6) Hood Rod:

{¶ 37} Muransky next claims that the hood rod was missing from the vehicle, which made it impossible to prop open the hood. A review of the record establishes that the buildsheet does not provide that Miller/Milzy was to complete any work on the hood or the hood rod. Furthermore, the hood rod does not affect the functionality of the vehicle. For these reasons, it was reasonable for the trial court to find that Miller/Milzy substantially completed the work contemplated in the settlement agreement despite the minor defect with the hood rod.

{¶ 38} Based on our review of the record, we find that there was competent, credible evidence for the trial court to find that Miller/Milzy substantially completed the work that was required by the settlement agreement.

*Damage to Vehicle*

**{¶ 39}** For his last argument, Muransky contends that the trial court erred in finding that he failed to establish his vehicle sustained damage while in Miller/Milzy's possession. Muransky claims that Miller/Milzy caused a paint chip on the front passenger wheel well, scrapes on the brake calipers, a large crack in the vehicle's front bumper, a dent in the trunk lid, and damage to the driver's seat upholstery. After a thorough review of the record, we find that there was competent, credible evidence in the record for the trial court to find that Muransky failed to establish that Miller/Milzy caused the aforementioned damage.

**{¶ 40}** A video taken by Muransky when he dropped off the vehicle to Miller/Milzy on November 14, 2016, establishes that the paint chips on the wheel well and the scuffs on the brake calipers were present at the time of drop off. *See* Defendant's Exhibit G. Photographs taken by Miller the same day also show the same paint chips and scuffs, as well as many other scuffs and scratches on various parts of the vehicle. *See* Defendant's Exhibit F, p. 179-197. Therefore, despite Muransky's claims, Miller/Milzy could not have caused this damage while working on the vehicle. In addition, Miller took photographs of the vehicle just prior to returning it on October 6, 2017, and those photographs do not show a large crack in the front bumper. *See* Defendant's Exhibit F, p. 198-200.

**{¶ 41}** Although Muransky was very thorough about taking video of his vehicle's condition when he dropped it off at Miller/Milzy's on November 14, 2016, he did not have any video or photographs taken of the vehicle when Miller/Milzy delivered it to the Line-X

body shop on October 6, 2017. Muransky did not photograph the damage until a week or two after the vehicle was delivered. Given Muransky's delay in photographing the damage, it is possible that the damage could have occurred while the vehicle was waiting to be picked up at Line-X. As previously noted, the owner of Line-X, Zachos, testified that he moved the vehicle in and out of his facility every day until Muransky retrieved it. Muransky provided no evidence excluding the possibility that all of the damage complained of could have occurred while the vehicle was being moved by Zachos.

{¶ 42} In addition, the trial court could have considered Muransky's credibility with regard to the damage claims. As previously noted, the trial court found that Muransky's credibility was undermined by the contents of the text messages between him and Harvey. As an appellate court, we defer to the trial court's determinations of credibility. *Umbaugh v. Stinson*, 2d Dist. Greene No. 2019-CA-62, 2020-Ohio-3299, ¶ 24. Therefore, for the foregoing reasons, we find that there was competent credible evidence for the trial court to find that Muransky failed to establish that Miller/Milzy caused the damage at issue.

{¶ 43} Because there was competent, credible evidence to support all of the trial court's findings that Muransky challenges on appeal, we find that the trial court's judgment enforcing the settlement agreement in Miller/Milzy's favor was not an abuse of discretion. Accordingly, Muransky's sole assignment of error is overruled.

## Conclusion

{¶ 44} Having overruled Muransky's assignment of error, the judgment of the trial

court is affirmed.

. . . . . . . . . . . . .

TUCKER, P.J. and FROELICH, J., concur.

Copies sent to:

Dwight D. Brannon
Kevin A. Bowman
Matthew C. Schultz
Ronald J. Kozar
Hon. Gregory F. Singer